12 Ill. App.3d 814 (1973)
299 N.E.2d 166
DOROTHY YUHAS, Plaintiff-Appellant,
v.
ALLIS-CHALMERS DISTRIBUTION SERVICE CORPORATION et al., Defendants-Appellees  (WILLIAM CREIGHTON, Defendant.)
No. 56762.
Illinois Appellate Court  First District (1st Division).
June 11, 1973.
*815 *816 Horwitz, Anesi, Ozmon & Associates, Ltd., of Chicago, (Nat P. Ozmon, Joseph Cerveny and Dario A. Garibaldi, of counsel,) for appellant.
Hinshaw, Culbertson, Moelmann, Hoban & Fuller, of Chicago, (D. Kendall Griffith and Joseph A. Camara, of counsel,) for appellees.
Reversed and remanded.
Mr. JUSTICE HALLETT delivered the opinion of the court:
The plaintiff sued three Allis-Chalmers corporations (hereinafter collectively called Allis-Chalmers) and William Creighton, its local dealer, for injuries sustained by her during an attempt by him to remove certain keys from the ignition of an Allis-Chalmers crawler tractor on which she was physically located. The trial court after a pre-trial settlement conference, during which the court indicated a settlement figure which was not acceptable to the plaintiff, entered summary judgment for Allis-Chalmers on the ground that it was not responsible for Creighton's actions and then, there remaining no Cook County defendants, transferred the case to LaSalle County where he resides. This appeal is from both orders.
The amended complaint alleged in substance that on August 31, 1967, Creighton wilfully or, in the alternative, negligently, injured the plaintiff during the course of an effort by him to remove certain keys from the ignition of a Caterpillar tractor on which the plaintiff was then physically located, and that Creighton, in that effort, was the agent, servant or employee of Allis-Chalmers. Its motion for summary judgment challenged its responsibility for his actions.
*817 The discovery depositions of William Creighton, the dealer defendant, and Clinton Peters, the defendant Allis-Chalmers' District Representative, were taken and filed.
Peters testified, in substance, as follows:
He had been employed by the Allis-Chalmers Manufacturing Company for fourteen years as district manager. His duties consisted of: (1) calling upon dealers; (2) stocking dealers; (3) assisting dealers with sales; (4) collecting money from dealers for merchandise sold. He also assisted the dealer in writing up contracts, financing statements and in the computation of payment schedules. As to collection of payments, he collected from the dealer and only dealt with the purchaser through the dealer. His territory consisted mostly of LaSalle County and he had seven dealers in his area.
William Creighton was a dealer in Leland, Illinois. He was a dealer, not a distributor. Creighton owned his own business in Leland, Illinois, as an individual, and he sold Allis-Chalmers equipment and also New Holland equipment.
Peters had no authority over Creighton but he supervised the dealers in his area and made recommendations to them to lead them to a more profitable business. He assisted them in making sales.
He did get involved with the collection of overdue payments. He would get notices from the Peoria Branch of Allis-Chalmers of payments which were past due. The dealer would also get a copy of this notice. He would put this notice in his dealer's file which was located in his own briefcase and, the next time he called on the dealer, he would bring it to the dealer's attention to see what action the dealer had taken. Sometimes he and the dealer would call on a customer together. If payment was not made, repossession of the equipment might occur. He would assist in repossession. He had no authority to request a dealer, such as Creighton, to repossess a piece of equipment. He could ask to use the dealer's equipment (such as a truck) to bring the equipment in.
If the dealer became "insecure," he could demand full payment from the customer. A dealer's insecurity could result from the condition of the machine, payment, or the manner in which the machine was being used. Allis-Chalmers could repossess a piece of equipment if it felt insecure. They became insecure in this case, but he did not know of any effort, on Allis-Chalmers' part, to repossess the crawler tractor involved in this case. In this case, it was up to him to repossess since the "paper" covering the sale of this machine had been sold to Allis-Chalmers.
The dealer has a contract with Allis-Chalmers called a Dealer's Sales and Service Agreement. Allis-Chalmers can cease and desist from doing *818 business with a dealer if the dealer violates the contract. If a dealer doesn't produce, Allis-Chalmers can go to a neighboring area and set up another dealership which will cut into the former dealer's business.
He knows Robert Smith, the purchaser of the crawler tractor involved in this case. He met him at Creighton's store in Leland, Illinois. Mr. Smith wanted to buy a crawler tractor. Eventually, the crawler tractor was sold to Mr. Smith. Mr. Peters assisted in drawing up the purchase agreement and the dealer's purchase order. The dealer's purchase order is the original agreement between the dealer and the customer with regard to the type of equipment to be sold.
A schedule of payments was worked out between Mr. Peters, Mr. Creighton and Mr. Smith. Mr. Smith was to make the payments directly to Allis-Chalmers in Morton, Illinois. This crawler tractor was financed through Allis-Chalmers. When the sale is made, the dealer normally gets one of three things: (1) cash; (2) a trade-in; or (3) a contract. The dealer sells the contract to Allis-Chalmers. The dealer signs a guarantee on such transactions. He guarantees payment by agreeing to repurchase the machinery if there is a default in payment.
If, in this case, Mr. Smith did not make payment, then Mr. Creighton, by virtue of his signed contract with recourse, would have to "pick up the tab". In this case, Creighton, as part of his contract with Allis-Chalmers, agreed to service the product through the warranty period of six months.
The dealer receives no cash from Allis-Chalmers. This is a paper transaction. The dealer uses paper (a contract) to pay Allis-Chalmers. The dealer uses the paper to clear his inventory. A dealer such as Creighton receives income over and above the invoice cost of sale. Normally, a dealer's profit is on the trade-in. A UCC-1 form, a financing statement, was filed in LaSalle County following the sale of the crawler tractor involved in this case. The vehicle was to remain in LaSalle County. He imagines it was his responsibility to see to it that the vehicle remained in LaSalle County. He never checked on the whereabouts of this crawler tractor. He has never been told to check on a piece of equipment.
Mr. Smith first became delinquent on payment in the summer of 1971. Mr. Peters received a notice. After receiving that notice, he put the notice in his Creighton file and planned to talk this over with Mr. Creighton when he next saw him. He received a second notice of payment due on Mr. Smith approximately two weeks to a month after the first notice. It is customary to discuss delinquency with a dealer and then go with the dealer to see the customer. He and Mr. Creighton called on Mr. Smith more than once. He never personally called on Mrs. Yuhas. He *819 and Mr. Creighton discussed repossession on several occasions. They discussed repossession with Mr. Smith.
He never asked Mr. Creighton to repossess the crawler tractor involved in this case. He had no authority to ask Mr. Creighton to repossess that crawler tractor. Repossession was Mr. Peters' responsibility. He didn't recall any instance where Mr. Creighton went to repossess the tractor. He didn't recall Mr. Creighton telling him that he had gone out in an attempt to repossess the crawler tractor. He never asked Mr. Creighton to keep track of the vehicle.
He was told by Mr. Creighton that the vehicle was missing. He suggested to Mr. Creighton that they both try and find the vehicle. They agreed to look for it. He did not recall any particular instance of his going to look for the tractor in the company of Mr. Creighton. He did not send Mr. Creighton to any particular place to look for the vehicle.
Mr. Creighton told him that the vehicle had been found. He may have asked a dealer if the dealer knew where a particular piece of equipment was. He never recalled asking a dealer to check on the particular piece of equipment without him. He made suggestions to a dealer. The dealer did not have to follow those suggestions. If the dealer did not follow his suggestions, he would personally follow-up on it himself. He has no control over the dealers in his area.
William Creighton testified, in substance, as follows:
In September of 1967, he was in business in Leland, Illinois, selling farm equipment. This business, which was in his name, had been operating since 1949. He sold both Allis-Chalmers and New Holland machinery and Shoreline equipment. He had franchise agreements with New Holland and Allis-Chalmers.
He had no quota from Allis-Chalmers in terms of a dollar amount that he was required to sell. There was no requirement for him to balance sales between Allis-Chalmers and New Holland. He was not required to purchase a certain amount of service parts. Allis-Chalmers paid him a volume discount on sales. His compensation would be the difference between the purchase he made for Allis-Chalmers and the price he got from the ultimate consumer. He received no salary from Allis-Chalmers. He was allowed to take trade-ins.
When he sold a product, he was not required to use any particular financing corporation. It was up to the customer. If a customer wanted to go through Allis-Chalmers Acceptance Corporation to finance a purchase, he would take a financial statement from that customer and submit it to the acceptance corporation. If Allis-Chalmers Acceptance Corporation did not accept a customer, then there was no sale unless the *820 customer obtained financing elsewhere, in which instance he would go through with the sale.
The Allis-Chalmers Acceptance Corporation would only be used on sales of Allis-Chalmers equipment. He was under no obligation to furnish a certain amount of business to them. The acceptance corporation had no control over the prices he would charge or the amount of the trade-in.
The acceptance corporation had a payment schedule. If the customer did not forward his payment, Allis-Chalmers expected him to take care of getting the money. He was responsible for collections. Payment to the acceptance corporation was either direct or through him. He would be notified by Allis-Chalmers of an overdue payment. He was not instructed as to a particular course of action after receiving notices concerning delinquency of payments.
He would act if he felt insecure. If either he or Allis-Chalmers felt concerned, they would contact the delinquent customer. He sent out his own personal statements of overdue accounts. He did not send out form letters belonging to Allis-Chalmers nor did he send out any letters which were composed by Allis-Chalmers. The district representative for Allis-Chalmers in his area was Clinton Peters. Mr. Peters called on him at least once a week in regard to sales.
The tractor involved in this case was sold to a Mr. Robert Smith and was financed by Allis-Chalmers Acceptance Corporation. A monthly statement schedule was set up. The tractor was bought by Mr. Smith for use by a Mr. Neal. There were many collection problems with regard to this tractor. He and Mr. Peters called upon "Mr. Smith and Mr. Neal".
The tractor disappeared and Mr. Creighton asked the local sheriff to find it. The sheriff found the vehicle on the farm of Dorothy Yuhas. He went out to the Yuhas farm in the middle of August. He was not instructed by anyone to go there. No one told him what to do once he got there. He verified the fact that the vehicle was at the Yuhas farm.
He went back to the Dorothy Yuhas farm on September 2, 1967. No one instructed him to go out there or what to do once he got there. He went out to the Yuhas farm in a pick-up truck that was owned by him and which was part of his business. He was asked by Mr. Clinton Peters if he was sure the vehicle was on the Yuhas property. He went out to see if the tractor was still there. He did this for both his and Allis-Chalmers' assurance. Mr. Peters had no authority to order him to go out to the Yuhas farm and see if the tractor was still there. He had told Mr. Peters that the tractor had been found.
He had no intention of repossessing the vehicle on September 2, 1967. *821 He just wanted to verify the fact that it was still on the Yuhas property. It was not decided until after September 2, 1967, to get the crawler tractor off the Yuhas property. He denied any physical contact between himself and Dorothy Yuhas on September 2, 1967.
Between his August and September 2, 1967, visits to the Yuhas farm, he had talked to Mr. Smith about delinquent payments. Prior to his August visit to the Yuhas farm, he had attempted to repossess this vehicle from Mr. Smith on more than one occasion. He was directed to do so by Allis-Chalmers. He never completely repossessed the tractor. He was in charge of repossession. His men and he began actual repossession. He paid the men who assisted him in the repossession attempts and only his equipment was used during these attempts. No compensation was paid to him or his employees by Allis-Chalmers for the attempt at repossession.
He was not instructed nor was he intending to repossess the tractor involved in this case on September 2, 1967. A decision on repossession was a mutual decision to be made by himself and Mr. Peters. He did not have to have Mr. Peters' permission to repossess. He would have obtained Mr. Peters' consent before attempting repossession.
 1 Determination of the issue of whether the relationship of principal and agent, or owner and independent contractor exists, unless the relationship is so clear as to be undisputed, is a question of fact to be decided by the jury.
 2-6 In Hulke v. International Mfg. Co., 14 Ill. App.2d 5, 142 N.E.2d 717, in affirming a jury verdict and judgment for the plaintiff, the court, at pages 32-33, said:

"It is contended by defendant that the court erred in submitting to the jury the question of the existence of an agency or employee relationship between Bunge's and Skelly with respect to the particular transaction out of which plaintiffs alleged their injuries arose. The law is clear that generally a master is liable for the acts of his servant and that a principal is liable for the acts of his agent, but that generally neither is liable for the acts of an independent contractor. Usually an agent is paid differently, has more freedom of action, and requires less supervision than a servant. An agent usually has more authority, works alone and has some discretion, not being subject to constant supervision and control of the principal. Unless the relationship is so clear as to be undisputed, the relationship between principal and agent is a question of fact for the jury to determine from all the evidence. The Supreme Court of Illinois has frequently stated that the *822 right or duty to supervise and control, and not the exercise of the right, determines the relationship. The relationship of principal and agent exists if the principal has the right or duty to supervise and control and to terminate the relationship at any time, even though he does not exercise that right. Hartley v. Red Ball Transit Co., 344 Ill. 534, 539; Lawrence v. Industrial Com., 391 Ill. 80, 87; Darner v. Colby, 375 Ill. 558; Shannon v. Nightingale, 321 Ill. 168.
[22] While defendant Skelly places particular emphasis on that part of the written Distributor Agreement between Bunge's and defendant Skelly which recites that Bunge's are the agents of defendant Skelly only for the purpose of leasing "Skelgas" equipment to "Skelgas" consumers, plaintiffs not being parties to the agreement are not conclusively bound by its terms. Other evidence tending to prove what the true relationship was between Bunge's and defendant Skelly was admissible to be considered by the jury as a question of fact in determining if Bunge's were the agents of defendant Skelly. Komorowski v. Boston Store of Chicago, 263 Ill. App. 88, 95; Washburn & Moen Manufacturing Co. v. Chicago Galvanized Wire Fence Co., 109 Ill. 71, 79; Reams v. Janoski, supra., p. 12; Northern Assur. Co. v. Chicago Mut. Building & Loan Ass'n, 198 Ill. 474, 477, 478; Hartley v. Red Ball Transit Co., supra., p. 542." (Emphasis ours.)
 7 In Tansey v. Robinson, 24 Ill. App.2d 227, 164 N.E.2d 272, in reversing a summary judgment for the defendant and remanding the cause, this court, at pages 233-234, said:
"The written contract is not conclusive of the relationship which may actually have existed between A & P, Robinson, and A & P's customers. That depends upon the actual practice followed by the parties and, as a general rule, becomes a mixed question of law and fact to be submitted upon proper instructions to a jury. Determination of the question of whether the relationship of employer and employee, principal and agent, or owner and independent contractor exists depends upon such facts as the matter of hiring, the right to discharge, the manner and direction of servants, the right to terminate the relationship, and the character of the supervision of the work done. Merlo v. Public Service Co. of Northern Illinois, 381 Ill. 300, 45 N.E. 2d 665 (1942). Unless those facts clearly appear, the relationship cannot become purely a question of law. Thiel v. Material Service Corp., 364 Ill. 539, 5 N.E. 2d 88 (1936). See also Jones v. Standerfer, 296 Ill. App. 145, *823 15 N.E. 2d 924 (1938); Ozan Lumber Co. v. McNeely, 214 Ark. 657, 217 S.W.2d 341, 343 (1949); 27 Am. Jur., Independent Contractors, sec. 60 (1940)." (Emphasis ours.)
In Donovan v. Raschke, 106 Ill. App.2d 366, 246 N.E.2d 110, in reversing a judgment for the owners of a building based on a directed verdict, this court at page 372, said:

"Determination of the issue of whether the relationship of principal and agent, or owner and independent contractor exists, unless the relationship is so clear as to be undisputed, is a question of fact to be decided by the jury. Thiel v. Material Service Corp., 364 Ill. 539, 5 N.E. 2d 88 (1936); Hulke v. International Mfg. Co., 14 Ill. App.2d 5, 142 N.E.2d 717 (1957). And in Tansey v. Robinson, 24 Ill. App.2d 227, 164 N.E.2d 272 (1960), this court found that what relationship existed depended upon such factors as the hiring, the right of discharge, the direction given to the employee, and the character of the supervision of the work." (Emphasis ours.)
 8 Without unduly extending this opinion by the restatement of the deposition testimony of William Creighton, the defendant dealer, and Clinton Peters, the defendant Allis-Chalmers' District Representative, we are of the considered opinion that such testimony, under the authorities above cited and discussed, presents a material question of fact to be decided by the jury as to whether the relationship of principal and agent or manufacturer and independent contractor exists. In Ryan v. Associates Investment Co., 297 Ill. App. 544, 18 N.E.2d 47, heavily relied upon by Allis-Chalmers, the relationship between the Associates and the tow truck operator was much less closely entwined than the relationship presented by the testimony in the case at bar.
 9-10 This, for all practical purposes, disposes of the case, inasmuch as it is well settled that, if a material issue of fact exists, summary judgment is improper, and the case must be submitted to the jury for its determination.
In Barkhausen v. Naugher, 395 Ill. 562, 70 N.E.2d 565, in reversing a summary judgment, our Supreme Court, at page 567, said:
"Where, as here, it is apparent that a controversy does exist, the entry of a summary judgment is improper. The provisions of the statute and the rules were intended to facilitate litigation and to expedite trial procedure through the use of the summary judgment. This, however, cannot be employed where it is shown that there is an actual dispute as to the facts and that there exists a triable issue."
*824  11-13 Perhaps the clearest statement covering the use of summary judgment is that of Mr. Justice Davis (then on the Appellate Court for the Second District but now on our Supreme Court) in Ruby v. Wayman, 99 Ill. App.2d 146, 240 N.E.2d 699, where, in reversing a summary judgment in favor of the defendant, he said, at pages 149-150:
"The principles applicable to a motion for summary judgment under section 57 of the Civil Practice Act (Ill. Rev. Stat. 1967, ch. 110, par. 57) are well defined. Summary judgment is a procedure to be encouraged (Allen v. Meyer, 14 Ill.2d 284, 292, 152 N.E.2d 576 (1958)); however, it is a remedy to be awarded with some caution so as not to preempt the right to a trial by jury or the right to fully present the factual basis for a case where a material dispute may exist. Solone v. Reck, 32 Ill. App.2d 308, 310, 311, 177 N.E.2d 879 (1961); Tezak v. Cooper, 24 Ill. App.2d 356, 362, 363, 164 N.E.2d 493 (1960).
Section 57 provides that a summary judgment should be rendered if the pleadings, depositions and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment or decree as a matter of law.
Courts have construed this section to mean that in determining if there is a genuine issue, inferences may be drawn from the facts which are not in dispute, and if fair-minded persons could draw different inferences from these facts, then a triable issue exists. Peirce v. Conant, 47 Ill. App.2d 294, 300, 198 N.E.2d 555 (1964).
In making the above determination on a motion for summary judgment, the court must construe the pleadings, depositions and affidavits most strictly against the moving party and most liberally in favor of the opponent. Solone v. Reck, supra., 311. A summary judgment should then be granted where the moving party's right thereto is clear and free from doubt. Palier v. Dreis & Krump Mfg. Co., 47 Ill. App.2d 334, 338, 198 N.E.2d 521 (1964); Solone v. Reck, supra., 310.
Applying these principles, we believe that the trial court should not have granted a summary judgment in favor of the defendant. The only function of the court, when presented with a motion for summary judgment, is to determine if a genuine issue exists as to a material fact; if not, summary judgment is proper; if so, summary judgment is improper, as the court may not summarily determine a material fact issue."
*825 To the same effect, see:

Tansey v. Robinson, 24 Ill. App.2d 227, 236-237, 164 N.E.2d 272; Tezak v. Cooper, 24 Ill. App.2d 356, 362-3, 164 N.E.2d 493; Solone v. Reck, 32 Ill. App.2d 308, 310-311, 177 N.E.2d 879; Lumbermens Mut. Cas. Co. v. Poths, 104 Ill. App.2d 80, 87-88, 243 N.E.2d 40; Southland Corp. v. Hoffman Est., 130 Ill. App.2d 311, 319-320, 264 N.E.2d 451.
Having concluded, first, that a material issue of fact exists, and, second, that this renders summary judgment improper, we reverse the summary judgment entered below on behalf of Allis-Chalmers, reverse also the order transferring the case to LaSalle County and remand the cause with directions to proceed in a manner consistent with the views above expressed.
Summary judgment and order transferring case reversed and cause remanded with directions.
GOLDBERG and EGAN, JJ., concur.