M. MATTHEW KOZASA, Plaintiff-Appellee, *v.* GUARDIAN ELECTRIC
MANUFACTURING CO., Defendant-Appellant.

First District (2nd Division)    No. 80-1946

Opinion filed August 18, 1981.

William J. Harte, of William J. Harte, Ltd., of Chicago (Julian R. Wilheim, Karla Wright, and David J. Walker, of counsel), for appellant.

John C. Erb, of Paul B. Episcope, Ltd., of Chicago, for appellee.

Mr. JUSTICE STAMOS delivered the opinion of the court:

M. Matthew Kozasa brought an action against Guardian Electric Manufacturing Company alleging breach of contract and seeking commissions allegedly due him. The trial court, sitting without a jury, found for plaintiff in the amount of $517,664.10, plus costs. Defendant appeals.

In the mid-1960's, plaintiff, a trade consultant, designed a relay (an automatic switch used in electrical products) which was superior to those available at that time. Plaintiff's idea was to incorporate insulating barriers in miniature 1 cubic inch relays which could qualify for Underwriters Laboratories approval. Plaintiff and a machinist built samples of his relay. In 1967, plaintiff went to Japan and agreed to let Koike Electrical Industrial Company, Ltd., manufacture the relays. Under the oral agreement, plaintiff would receive a manufacturing fee or royalty of

2 percent of the sales price. In the event Koike ceased making the relays, its interest in the design would revert to plaintiff. Plaintiff returned to the United States to locate a distributor and met with Donald O. Boucher, the assistant general manager and assistant to the president of defendant Guardian Electric. Plaintiff told Boucher that he had designed the relay.

On November 16, 1967, plaintiff met with Boucher and Frank Rowell, Jr., president of Guardian. At trial, Rowell testified that at this meeting in Rowell's office in Chicago, the parties orally agreed to an arrangement whereby plaintiff would be a "finder" for a source of relays in Japan for Guardian and that the arrangement related only to those relays manufactured by Koike and purchased by Guardian in the future. Rowell testified that plaintiff was not authorized to negotiate or sign a contract for Guardian. In return for his efforts, plaintiff was to receive commissions at the rate of 10 percent of the purchases by Guardian from Koike of the subject relays. These commission payments were due prior to the close of the month immediately following the month in which shipments and invoices were received by Guardian. No mention was made of the 2-percent fee to be paid by Koike to plaintiff.

Pursuant to his oral contract with Guardian, plaintiff brought Guardian and Koike together. On January 1, 1968, Guardian and Koike entered into a written contract whereby Guardian acquired the exclusive rights to sell and distribute the relays (designated as series 1310AC and series 1315DC relays) in the United States and Canada, with the exception of Idaho and Wyoming. Plaintiff took no part in the contract negotiations. The parties agree that plaintiff's obligations under the November 16, 1967, oral contract were fully performed upon bringing defendant and Koike together.

On January 2, 1968, defendant attempted to "renegotiate" its oral contract with plaintiff and sent him a proposed written contract. This proposal provided for declining percentage commissions rather than a straight 10 percent but was identical in all other respects to the oral agreement. Plaintiff did not accept this offer and did not return the writing to defendant.

On February 24, 1968, plaintiff entered into a written contract with Koike granting Koike exclusive rights to manufacture and sell the relay in exchange for a royalty of 2 percent of Koike's selling price. Koike began producing the relays, but early in 1969 encountered some manufacturing difficulties which slowed production and decreased profits. In an effort to offset these losses, plaintiff voluntarily reduced his commission rate from Guardian to 5 percent from the agreed 10 percent until the production problems could be cured.

On December 15, 1969, Boucher wrote plaintiff concerning Boucher's recent trip to Japan to visit Koike and another supplier. The letter

expressed appreciation for plaintiff's locating a supplier for Guardian and went on to say:

> "Inasmuch as you act as a 'finder' for Guardian, as compared to a sales representative, we have decided to give you an annual retainer for your services. We have discussed this with Koike and Toyo and advised them that we would be completely responsible for your compensation. We believe that the amount stated in the enclosed agreement [providing for an annual retainer of $5,000] is fair for the services rendered."

This letter impliedly shows that defendant was then aware of plaintiff's 2-percent fee from Koike. Nevertheless, defendant offered plaintiff a new contract for expanded services at an annual retainer fee of $5,000.

By letter of January 6, 1970, plaintiff rejected defendant's offer and insisted that the commissions of 10 percent continue. Defendant's response to this rejection was made on January 19, 1970, when defendant mailed plaintiff a "final check * * * under the old arrangement as a 'finder' for Guardian Electric." The January 19 letter went on to say that Frank Rowell, Jr., would answer plaintiff's January 6 letter personally when he returned from a trip. Rowell replied on February 10 and, in regard to plaintiff's rejection of the annual retainer offer, stated, "Frankly, Matt, if I were you, I would consider the situation from this basis; something is better than nothing."

Guardian stopped making payments to plaintiff, as did Koike, apparently at Guardian's request. Having already been paid for the December 1969 shipments of relays, the next commission payment from defendant to plaintiff was for the January 1970 shipments and was due on or before February 28, 1970. Throughout 1968 and 1969 plaintiff was paid commissions on relays sold through defendant's Canadian sales representative, A. C. Simmonds, because defendant had the exclusive distribution rights in Canada. On January 26, 1970, defendant requested Simmonds to cease making commission payments to plaintiff because defendant was "going to pick up" the payment of those commissions.

Plaintiff filed his original complaint for breach of contract on February 5, 1975, and filed an amended complaint for breach of contract on October 24, 1978. Defendant moved to dismiss the amended complaint on the basis of the 5-year statute of limitations (which both parties agree governs the subject oral contract) and the Statute of Frauds. The trial court denied defendant's motion and this court denied defendant's subsequent motion for an interlocutory appeal. Defendant's answer raised the affirmative defense of fraud based on plaintiff's concealment of his fee arrangement with Koike.

By agreement of the parties, the case was tried without a jury and with the liability and damages portions bifurcated. Because a number of

defendant's invoices were lost or destroyed by defendant, an accountant estimated the probable purchases from Koike for these missing periods. The trial court found defendant liable in the sum of $517,664.10 for commissions on the relay purchases from January 1, 1970, to February 28, 1980. Defendant has continued to purchase relays from Koike and is currently part owner of Koike.

Defendant's first contention is that the 5-year statute of limitations applicable to oral contracts (see Ill. Rev. Stat. 1979, ch. 83, par. 16) had run prior to plaintiff's instituting this action. Specifically, defendant asserts that the November 16, 1967, oral contract was breached at the very latest on January 19, 1970, when defendant mailed plaintiff the "final check" under the old arrangement. Defendant contends that it twice repudiated the oral contract, first on December 15, 1969, in its letter stating no commissions would be paid past 1969. Therefore, defendant argues, the statute of limitations began to run at the latest on January 19, 1970, and the 5 years had passed before suit was filed on February 5, 1975. While not mentioning anticipatory repudiation by name, defendant asks this court to apply that doctrine and declare that the statute of limitations ran from the time of the repudiation rather than from the time performance was due. Plaintiff asserts that the statute of limitations did not begin to run until February 28, 1970, when defendant first failed to pay a commission due under the contract.

The statute of limitations begins to run when facts exist which authorize the bringing of an action. (*Meeker v. Summers* (1979), 70 Ill. App. 3d 528, 529, 388 N.E.2d 920.) A cause of action accrues and the statute of limitations begins to run when a creditor may legally demand payment from a debtor. (See *Mazur v. Stein* (1942), 314 Ill. App. 529, 534, 41 N.E.2d 979; see also *Isham v. Cudlip* (1962), 33 Ill. App. 2d 254, 266, 179 N.E.2d 25.) The facts of the present case clearly show that payment under the contract was due on February 28, 1970. Only then could plaintiff legally demand payment from defendant for the commissions due under the contract. Only then did a cause of action accrue and the 5-year statute of limitations begin to run.

Defendant endeavors to avoid this result by asserting that plaintiff's cause of action against defendant accrued, and the statute of limitations began to run, when defendant repudiated the contract. Although claiming that a repudiation occurred on December 15, 1969, defendant uses January 19, 1970, as the date that the operative repudiation took place and thus when the statute began to run. In effect, defendant attempts to use his anticipatory breach of the contract to start the running of the statute of limitations prior to the time set for performance in the contract. *Cf. Kansas City v. Kansas City Transit, Inc.* (Mo. 1966), 406 S.W.2d 18, 24, *cert. denied* (1967), 385 U.S. 1036, 17 L. Ed. 2d 682, 87 S. Ct. 776)

(rejecting defendant's attempt to use an anticipatory repudiation to trigger the statute of limitations).

■■ Defendant overlooks the fact that the doctrine of anticipatory repudiation is inapplicable where the plaintiff has completely performed and the defendant has not. (See *M. A. Felman Co. v. WJOL, Inc.* (1968), 104 Ill. App. 2d 66, 78, 243 N.E.2d 33; *Guaranty Bank & Trust Co. v. Reyna* (1964), 51 Ill. App. 2d 412, 424, 201 N.E.2d 144; see also Restatement of Contracts §318, at 475 (1932); Faletti, *Breach, Repudiation and Damages in Contract Litigation—Legal and Economic Theory,* 1954 U. Ill. L.F. 615, 619 (1954).) The parties agree that plaintiff has performed all his duties under the contract. Therefore, the doctrine of anticipatory repudiation does not apply. We note that while defendant attempts to apply the principle of anticipatory repudiation and have the statute of limitations begin at the time of the repudiation, defendant also admits that the doctrine should not apply to this case because plaintiff has performed all his contractual duties. We hold that anticipatory repudiation is inapplicable to the present case. Defendant's alternative position is that the "final check" of January 19, 1970, was not an anticipatory repudiation but rather an actual breach of the contract. We find that no breach occurred until February 28, 1970, when defendant failed to perform under the contract. Only then could plaintiff legally demand performance. See *Pratt v. Sears Roebuck & Co.* (1979), 71 Ill. App. 3d 825, 829, 390 N.E.2d 471.

Even if the doctrine of anticipatory repudiation applied to this case, the result would not change. Where a promisee receives an anticipatory repudiation by the promisor, the former may either sue immediately or, at his option, wait until the scheduled time of performance under the contract to bring an action for breach. (*Lake Shore & Michigan Southern Ry. v. Richards* (1894), 152 Ill. 59, 90, 38 N.E. 773; *Builder's Concrete Co. v. Fred Faubel & Sons, Inc.* (1978), 58 Ill. App. 3d 100, 104, 373 N.E.2d 863.) In such a case, the doctrine of anticipatory repudiation has no effect on the running of the statute of limitations. In *White v. Prenzler* (1956), 7 Ill. 2d 624, 628-29, 131 N.E.2d 540, the Illinois Supreme Court stated:

"[A]s regards statutes of limitations, where the action is for breach of contract, evidenced by a repudiatory act, * * * courts have allowed immediate action for anticipatory breach, but also have allowed the offended plaintiff an option to wait for the original date without being prejudiced by the running of the statute."

Similarly, the Restatement of Contracts states that where no action for anticipatory breach is brought, the period of the statute of limitations begins to run only from the time fixed by the contract. Restatement of Contracts §322, at 483 (1932); see *Kansas City,* at 24-25.

■■ It thus seems clear that whether or not the doctrine of anticipatory

repudiation applies, the 5-year statute of limitations did not begin to run until February 28, 1970. Plaintiff filed his original complaint on February 5, 1975, within the statutory period.

None of the cases cited by defendant supports its position. *Kopel v. Board of Education* (1971), 1 Ill. App. 3d 1083, 275 N.E.2d 772, involved an actual breach followed by a repudiation of the contract, rather than a repudiation followed by an actual breach. The dictum in *Kopel* cited by defendant fails to include the fact that the payment for services rendered had been due months before the alleged written repudiation. Plaintiff correctly points out that, if anything, the *Kopel* court *extended* the start of the statute of limitations to the date of the repudiation from the earlier date when payment was due. The other cases cited by defendant are likewise distinguishable from the facts of the case at bar.

Defendant further asserts that the allegations in the amended complaint, filed on October 24, 1978, did not grow out of the "same transaction or occurrence" alleged in plaintiff's original complaint and are therefore insufficient to permit the amended pleading to relate back to the original. (See Ill. Rev. Stat. 1979, ch. 110, par. 46(2).) Specifically, defendant claims that it was "compelled by law" to treat the original complaint as claiming breach of a written contract, rather than breach of an oral contract as alleged in the amended complaint. Therefore, defendant argues, the filing of the original complaint did not satisfy the statute of limitations, and the 5-year period ran out prior to the filing of the amended complaint.

■■ We find no merit in defendant's contention that the original and amended complaints did not grow out of the same transaction or occurrence. In any event, the question is not properly before this court. "All defects in pleadings, either in form or substance, not objected to in the trial court are waived." (Ill. Rev. Stat. 1979, ch. 110, par. 42(3).) "All objections to pleadings shall be raised by motion. The motion shall point out specifically the defects complained of * * *." (Ill. Rev. Stat. 1979, ch. 110, par. 45(1).) In the case at bar, defendant failed to specifically point out the alleged defect in the amended complaint. Defendant merely asserted that the statute of limitations barred the amended complaint. Defendant never brought before the lower court the assertion that the amended complaint did not grow out of the same transaction or occurrence as the original complaint. In fact, the record is replete with statements made by defendant's counsel that the original and amended complaints were both based on an oral contract.

Defendant next asserts that the trial court erred in ruling that defendant failed to sustain its burden of proof on its affirmative defense of fraud. Defendant claims that plaintiff was its agent and therefore had a duty to inform defendant of the 2-percent royalty plaintiff was receiving

from Koike. Plaintiff's failure to disclose this, defendant says, amounted to fraud which should foreclose plaintiff from collecting commissions. Plaintiff asserts he was not defendant's agent but rather a middleman. Defendant agrees that a middleman need not disclose to all parties his acceptance of dual commissions. (See generally *Whiston v. David Mayer Building Corp.* (1949), 337 Ill. App. 67, 71, 84 N.E.2d 858; *Jones v. Missouri Lumber & Mining Co.* (1911), 166 Ill. App. 266, 269.) The issue of whether an agency relationship exists is a question of fact. (*Allstate Insurance Co. v. National Tea Co.* (1975), 25 Ill. App. 3d 449, 462, 323 N.E.2d 521; *Krug v. Machen* (1974), 24 Ill. App. 3d 526, 531, 321 N.E.2d 85; *Yuhas v. Allis-Chalmers Distribution Service Corp.* (1973), 12 Ill. App. 3d 814, 821, 299 N.E.2d 166.) The finding of the trial court regarding the existence of an agency relationship will not be disturbed unless it is against the manifest weight of the evidence. See *Krug*, at 531; *Meyer v. Ranson* (1967), 80 Ill. App. 2d 175, 178, 224 N.E.2d 293.

The test of agency is the existence of the right to control the method or manner of accomplishing a task by the alleged agent (*Allstate*, at 462), as well as the agent's ability to subject the principal to personal liability. (*Krug*, at 531-32.) As was stated in *Hoffman & Morton Co. v. American Insurance Co.* (1962), 35 Ill. App. 2d 97, 102, 181 N.E.2d 821, "The distinguishing characteristic of an agent is that he represents another contractually. When properly authorized, he makes contracts or other negotiations of a business nature on behalf of his principal, by which his principal is bound. (Mechem, Outlines of the Law of Agency, 1952 Ed. p 4.)" On the other hand, the "middleman" or "go-between" has nothing to do with negotiations, and thus it is of no importance that both parties pay him. *Whiston*, at 71.

Defendant in this case did not have the right to control plaintiff's method or manner of bringing the parties together. Plaintiff did not have the authority to negotiate on defendant's or Koike's behalf or bind defendant or Koike contractually. He played no part in the negotiating or drafting of the contract between defendant and Koike. Defendant's president, Frank Rowell, testified that plaintiff's role was that of a "finder."

■■ For plaintiff to be guilty of fraud for failing to disclose his receipt of dual payments, he must be shown to have had a duty to disclose such receipts. (See *Allensworth v. Ben Franklin Savings & Loan Association* (1979), 71 Ill. App. 3d 1041, 1044, 389 N.E.2d 684; *Perlman v. Time, Inc.* (1978), 64 Ill. App. 3d 190, 195, 380 N.E.2d 1040.) Defendant has attempted to prove the existence of such a duty by asserting that plaintiff was defendant's agent. A review of the record discloses insufficient evidence of the existence of an agency relationship between plaintiff and defendant. We also note that the record is devoid of evidence of bad faith

on the part of plaintiff. Defendant asserts that plaintiff had numerous opportunities to act in bad faith. The opportunities of a middleman, as distinguished from those of an agent, are irrelevant. The trial court's determination that defendant failed to met its burdens of showing that plaintiff was its agent and of proving fraud is not against the manifest weight of the evidence and will not be disturbed.

■■ Defendant's next argument is that the enforcement of the oral contract is barred by the Statute of Frauds. (See Ill. Rev. Stat. 1979, ch. 59, par. 1.) However, the law in Illinois is clear that an oral contract is not unenforceable under the Statute of Frauds if the contract has been completely performed by one party. (See, *e.g., David v. Schiltz* (1953), 415 Ill. 545, 555, 114 N.E.2d 691; *Mapes v. Kalva Corp.* (1979), 68 Ill. App. 3d 362, 368, 386 N.E.2d 148; *Reiss v. El Bauer Chevrolet Co.* (1968), 96 Ill. App. 2d 266, 269, 238 N.E.2d 619; see also 20 Ill. L. & Prac. *Statute of Frauds* §91 (1956).) As stated in *Mapes*, it has been the law of Illinois since *Swanzey v. Moore* (1859), 22 Ill. 63, that executed, as opposed to executory, contracts are never voided by the Statute of Frauds. (68 Ill. App. 3d 362, 368.) It is clear that plaintiff has fully performed his contractual obligation of bringing the parties together.

■■ Defendant's next contention, that damages for periods after 1971 were not proven, is based on the assumption that it would not have continued to purchase relays from Koike had plaintiff made a prompt claim for his commissions. However, the record is devoid of any evidence that such is the case. In fact, there is undisputed evidence that defendant continued to purchase relays throughout the six-year history of the present litigation, *after* it became aware that plaintiff had an interest in pursuing the commissions contractually due him. In view of this course of conduct and the plain language of the contract calling for a 10-percent commission on the relays, defendant's claim that damages are speculative is without merit.

■■ Defendant's next allegation is that the trial court erred in admitting plaintiff's reconstruction of 90 missing invoices and in relying on the reconstruction in computing damages. These 90 invoices for relay purchases were in the possession of defendant until they were lost or destroyed. The procedure used by plaintiff's accountant in reconstructing the missing invoices was as follows: the data from the 604 invoices produced by defendant were fed into a computer. The computer then printed out information from which a 9-year pattern of purchases by defendant from Koike was projected. From this information the accountant determined that 67 percent of the invoices included sales of the subject relays and computed the average cost per relay for the time periods for which the invoices were missing. The method used was consistent with generally accepted accounting principles and had been

used by the accountant in his practice with many major corporations. Further testing was also carried out using letters of credit information obtained by the Continental Bank. At trial, defendant offered no alternative means of recreating the missing invoices and did not dispute any of the calculations by plaintiff's expert witness. Relay purchases for the periods in which purchases were estimated totaled $463,959, yielding commissions of $46,395.90. We conclude the method used by plaintiff to determine the relay purchases for those periods in which invoices were unavailable was a fair and reasonable one. Furthermore, since plaintiff's computations were not challenged below, the issue of their reliability cannot be raised for the first time on appeal. See *Kravis v. Smith Marine, Inc.* (1975), 60 Ill. 2d 141, 147, 324 N.E.2d 417.

■■ The trial court ruled that the relays in the "letter" series bought from Koike by defendant were essentially the same as the original relays designed by plaintiff. The damages awarded plaintiff were in accord with this determination. Defendant claims that the trial court erroneously excluded evidence concerning the letter series of relays. The court below heard evidence from both sides concerning the letter series. Defendant's president testified that except for some minor changes, the letter series duplicated earlier series. Blueprints, diagrams, sample relays and defendant's sales catalog were all before the court below. The trial court based its determination on this evidence. Some of the evidence proferred by defendant concerning the letter series was cumulative. The trial court has discretion to exclude such cumulative evidence. (See *Christopherson v. Hyster Co.* (1978), 58 Ill. App. 3d 791, 805, 374 N.E.2d 858; *Gaenzele v. B. E. Wallace Products Corp.* (1976), 39 Ill. App. 3d 93, 99, 350 N.E.2d 571; *Ross v. Pfeifer* (1976), 39 Ill. App. 3d 789, 796, 350 N.E.2d 797.) Only when there is a clear abuse of discretion will such a decision by the trial court be reversed. (See *Christopherson*, at 804; *Cratsley v. Commonwealth Edison Co.* (1976), 38 Ill. App. 3d 55, 59, 347 N.E.2d 496; *Cole v. Brundage* (1976), 36 Ill. App. 3d 782, 800, 344 N.E.2d 583.) We find no such abuse of discretion by the trial court.

■■ Defendant's final contention is that it should not be charged with paying commissions on its Canadian licensee's (A. C. Simmond's) relay purchases from Koike. This contention is completely without merit. Defendant had the exclusive rights to distribute and sell the relays in the United States and Canada. In 1968, defendant imported the relays from Koike and marketed them in Canada through A. C. Simmonds. Plaintiff was paid his commissions by defendant. In 1969, defendant permitted A. C. Simmonds to import the relays directly from Koike so as to avoid a double import duty. During this period, A. C. Simmonds, paid plaintiff his commissions. On January 26, 1970, defendant asked A. C. Simmonds to cease making payments to plaintiff because defendant would pay him

directly. Defendant's president testified that defendant was "going to pick up" the payment of commissions. Defendant's contention that it could license out the distribution rights to the relays and thereby avoid the commission payments is without support. As pointed out by plaintiff, such logic would permit defendant to set up sales representatives throughout its exclusive territory and allow them to import directly, thereby completely avoiding the payment of commissions. Such a result was obviously not the intent of the parties when they entered their oral contract and will not be condoned by this court.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

DOWNING and PERLIN, JJ., concur.