JOSEPH P. DeSANTIS, Indiv. and on Behalf of All Other Persons Similarly Situated, Plaintiff-Appellant, v. BRAUVIN REALTY PARTNERS, INC., *et al.*, Defendants-Appellees.

First District (2nd Division) No. 1—91—3818

Opinion filed June 8, 1993.

Beigel & Sandler, Ltd., of Chicago (Herbert Beigel and Stephen D. Sharp, of counsel), for appellant.

Shefsky & Froelich, Ltd., of Chicago (Barry B. Gross, Clifford E. Yuknis, Tami J. Diamond, and Cary E. Donham, of counsel), for appellees.

JUSTICE SCARIANO delivered the opinion of the court:

In early 1983, defendants Brauvin Realty Partners, Inc., Sheldon Lavin, Jerome Brault and Cezar Froelich formed Brauvin Real Estate Fund Limited Partnership 3 as an investment entity which would focus on commercial real estate. They served as its general partners and, at all times relevant to the issues in this case, controlled its promotion and subsequent operation. In an advertising brochure, the partnership was marketed as a conservative investment vehicle, which was likely to be profitable and would provide ancillary tax benefits through the distribution of the partnership's passive investment loss tax deductions. The brochure also stated that the partnership's principle objective was capital preservation, which it would achieve by purchasing fully occupied commercial buildings.

Before subscribing to the partnership, plaintiff Joseph DeSantis acknowledged that he received the partnership's 112-page prospectus dated April 28, 1983. The cover of the prospectus contained the following prominent warning, written in upper-case letters and in larger than normal type: "THIS OFFERING INVOLVES RISK FACTORS CERTAIN OF WHICH ARE SUMMARIZED ON THE FOLLOWING PAGES, AND SUBSTANTIAL COMPENSATION TO THE GENERAL PARTNERS AND THEIR AFFILIATES." It then directed the reader to turn to the sections entitled "Risk and Other Important Factors" and "Compensation Table" for a more thorough explanation of the warning. On its fifth page, the prospectus summarized the goals of the partnership and explained its investment strategy. While stating that two of the objectives of the partnership were the preservation and protection of capital, it immediately thereafter admonished that there were no assurances that these objectives would be fulfilled.

The prospectus went on to detail extensively the multiple risks involved in real estate investments in general, and warned that included in those risks was the potential that a limited partner could lose his or her entire investment. One of the risks it advised of was that the success of the venture depended on the occupancy rates of the buildings it purchased, and that the rates could be adversely affected by economic factors. It included a specific admonishment that although the partnership would attempt to assume existing mortgages in order to purchase properties, it reserved the right to employ a type of financing which greatly increased the risk of foreclosure of the properties it purchased. Under a subheading entitled "CONFLICTS OF INTEREST," the prospectus also advised potential investors that the general partners would be compensated out of partnership assets, and it further provided an extensive schedule illustrating when and how much compensation the partners would be entitled to draw from its assets.

In November 1983, plaintiff subscribed for five units of the partnership, investing $5,000, and defendants, after selling nearly $8 million worth of interests in the partnership, closed the offering on December 31, 1983, and commenced operations. In 1984, the partnership purchased interests in three properties, one in Tulsa, Oklahoma, another in Palm Bay, Florida, and a third in Albuquerque, New Mexico. Although originally purchased with conventional financing, the Tulsa property's loan was refinanced in 1988 when the partnership gave its lender a mortgage securing a negative amortization note. According to plaintiff's explanation, this type of financing required the borrower to pay only interest "and bore an interest rate above the amount payable on that mortgage—accrued but unpaid interest being added to the principal."

Beginning in 1984, the partnership began to pay quarterly distributions which were affixed to a report updating investors on its financial status. Each report provided a balance sheet, an indication of changes in its financial status and a short summary of the activity taken in the previous period. Each annual report, which included the statement of the partnership's outside auditor, gave a more complete summary of its operations and its financial condition. The reports included references to the use of negative amortization financing in both the Tulsa and the Albuquerque properties, the current occupancy rates of the buildings to which the partnership had acquired title, and the extent of compensation and bonuses and other benefits paid to the general partners. Beginning with the first report sent to investors, they were continually apprised of the occupancy rate of the proper-

ties. For example, the report for the third quarter of 1984 stated that there was a sizable increase in the vacancy rate of one of the properties, and that defendants were aggressively attempting to lease the space. The subsequent reports presented similar disclosures concerning the occupancy rates of the properties for the years 1985 through 1989. Moreover, the partnership made similar disclosures in filings tendered, as required, to the Securities and Exchange Commission and the Internal Revenue Service (IRS) which were available to the public and to investors alike.

In 1989, for a reason not apparent from the record, the partnership defaulted on its indebtedness arising from the Tulsa property, and in satisfaction of the debt, surrendered its interest in the building to the mortgagee. On February 15, 1991, plaintiff filed the instant action, asserting, in a complaint framed as a class action, that defendants' fraudulent misrepresentations caused him and others like-situated to purchase what later proved to be a virtually worthless security. He also alleged that defendants breached their fiduciary duties to their limited partners and were liable for negligently misinforming plaintiff of the risks inherent in the real estate investments they were to make.

In response, defendants filed a section 2—619 motion (Ill. Rev. Stat. 1991, ch. 110, par. 2—619) asserting that because plaintiff's causes of action for fraud, fraudulent inducement, breach of fiduciary duty and negligence accrued in 1983, they were time-barred by the five-year limitations period of section 13—205 of the Code of Civil Procedure. (Ill. Rev. Stat. 1991, ch. 110, par. 13—205.) Defendants also claimed, via a section 2—615 motion (Ill. Rev. Stat. 1991, ch. 110, par. 2—615), that the complaint was insufficient as a matter of law. The trial court granted defendants' motions holding, *inter alia*, that the action was time-barred and that defendants had no fiduciary duty to plaintiff. On appeal, plaintiff asserts that the trial court erred: (1) in its determination that his claims were stale, being beyond the limitations period; (2) in its holding that the plaintiff's reliance on defendants' purported fraudulent misrepresentations was unreasonable as a matter of law; and (3) in holding that he had not alleged facts sufficient to plead a cause of action for breach of fiduciary duty. However, because we affirm the circuit court's decision as to the first of plaintiff's assertions of error and hold that issue to be fully dispositive of the entire appeal, we find no need to address the latter two issues.

■ Plaintiff argues that the trial court erred when it found that all of his purported causes of action arising from defendants' allegedly fraudulent solicitation of an interest in the limited partnership fell

outside the applicable limitations period and thus were time-barred. The parties agree that all of his alleged claims were governed by the catch-all provision of section 13—205 of the Code of Civil Procedure (Ill. Rev. Stat. 1991, ch. 110, par. 13—205),[1] which provides:

> "[A]ll civil actions not otherwise provided for, shall be commenced within 5 years next after the cause of action accrued."

(See also *Munsterman v. Illinois Agricultural Auditing Association* (1982), 106 Ill. App. 3d 237, 435 N.E.2d 923 (recognizing that an action for fraudulent misrepresentation is governed by the five-year limitations provision).) We are consequently called upon to decide when the five-year limitations period of section 13—205 began to run with regard to plaintiff's various causes of action arising from defendants' conduct.

"Generally, the statute of limitations begins to run from, and not until, the time that the cause of action or right accrues, *i.e.*, when facts exist which authorize the bringing of an action." (*Schreiber v. Hackett* (1988), 173 Ill. App. 3d 129, 131, 527 N.E.2d 412, 413; accord *Berg & Associates, Inc. v. Nelsen Steel & Wire Co.* (1991), 221 Ill. App. 3d 526, 532, 580 N.E.2d 1198, 1201 ("The statute of limitations begins to run when a party to be barred has the right to invoke the aid of the court and to enforce his remedy"), *appeal denied* (1992), 143 Ill. 2d 635, 587 N.E.2d 1011; *Kozasa v. Guardian Electric Manufacturing Co.* (1981), 99 Ill. App. 3d 669, 673, 425 N.E.2d 1137, 1141 ("The statute of limitations begins to run when facts exist which authorize the bringing of an action").) In the case at bar, plaintiff's complaint, filed in February 1991, alleged that defendants' deceptive marketing brochure induced him to purchase a limited partnership interest in 1983, and after a downturn in the real estate market in the late 1980s, he lost money on his investment.

---

[1]In the trial court, plaintiff included paragraphs in his complaint alleging that defendants actively concealed the information relevant to his discovery of their fraud, and therefore, the applicable limitations period would be that contained in section 13—215 (Ill. Rev. Stat. 1991, ch. 110, par. 13—215) or, alternatively, that the circuit court should toll the running of the limitations period until February 14, 1990, when defendants informed the investors that the mortgagee had taken title to the property in Tulsa, Oklahoma, in satisfaction of the partnership's obligation. However, in his appeal, plaintiff does not urge this court to apply section 13—215's limitations period nor does he assert that the trial court erred in not invoking the doctrine of equitable tolling in order to deny defendant's section 2—619 motion. Accordingly, we deem those issues to be waived. 134 Ill. 2d R. 341(e)(7); see also *Certain Taxpayers v. Sheahen* (1970), 45 Ill. 2d 75, 256 N.E.2d 758.

Applying the general rule, the trial court found plaintiff's actions barred because he could have sought judicial redress for defendants' alleged misrepresentations beginning, at the latest date, in 1985. It opined that the disclosures and warnings of potential risk contained in the prospectus, which plaintiff acknowledged in writing that he had received, as well as the multiple public filings made with the Securities and Exchange Commission and the IRS, truthfully provided all the information which plaintiff asserted was misstated in the sales brochure and was material to his decision to buy the partnership stake and which defendants, in their effort to induce him to purchase the interest, fraudulently withheld from him. Most important, the court emphasized the fact that plaintiff received quarterly and annual reports on the status of the partnership, all of which informed the limited partners of the occupancy status of the partnership's three properties, the fact that the partnership financed the properties using negative amortization wrap-around balloon mortgages, and that defendants compensated their efforts on behalf of the partnership out of partnership assets. The trial court recognized that since plaintiff's complaint centered on the fact that the sales brochure did not apprise potential investors of these three discrete pieces of information, his cause of action resulting from the alleged nondisclosure accrued as soon as he learned or reasonably could have learned that the sales brochure concealed these three allegedly material facts. The court fixed that date at sometime in 1984 or 1985 and found, accordingly, that the statute of limitations barred plaintiff's claim arising from those alleged misrepresentations no later than 1990.

Plaintiff does not disagree on appeal that by the year 1984 or 1985, the reasonably diligent investor would have discovered that, in reliance on defendants' false representations, he had been deceptively induced to purchase an interest in the limited partnership. Instead, he attempts to avoid the effect of the general rule, which would hold that his cause of action accrued no later than 1985, by contending that because damages are an element of the tort, even though he may have known that he was defrauded in 1984 or 1985, he could not bring an action for the fraudulent misrepresentation until such time that he suffered a monetary loss, which in this case did not occur until 1989.

■■ ■ Plaintiff's argument exhibits a confusion over the difference between a cause of action and a remedy for the wrong it asserts. Although our supreme court has held that the elements of fraudulent misrepresentation include " 'damage to the [plaintiff] resulting from such [justifiable] reliance [on the truth of the intentionally false

statement]' " (*Gerill Corp. v. Jack L. Hargrove Builders, Inc.* (1989), 128 Ill. 2d 179, 193, 538 N.E.2d 530, 536, quoting *Soules v. General Motors Corp.* (1980), 79 Ill. 2d 282, 286, 402 N.E.2d 599),[2] we do not read that to mean that a plaintiff who discovers that he has been defrauded by another is legally impotent until such time that he actually suffers a monetary loss. Rather, the courts will allow the as yet nonmonetarily injured plaintiff to seek rescission of the contract that was procured by fraudulent means. "One induced to contract through the fraud of another may elect to rescind the contract and recover the consideration paid, or affirm the contract and recover the difference between the property received and what he or she would have received but for the fraud." (*Beaton & Associates Ltd. v. Joslyn Manufacturing & Supply Co.* (1987), 159 Ill. App. 3d 834, 844, 512 N.E.2d 1286, 1292; see also *Pinelli v. Alpine Development Corp.* (1979), 70 Ill. App. 3d 980, 1000, 388 N.E.2d 943, 957; *In re Estate of Neprozatis* (1978), 62 Ill. App. 3d 563, 570, 378 N.E.2d 1345, 1351.) We may safely assume that plaintiff appreciated that rescission was available as a remedy for defendants' purported fraud in light of the fact that the prayer for relief in his complaint included that specific remedy as one of the many to which he claimed himself entitled due to defendants' conduct. Consequently, we hold that plaintiff had a cause of action no later than 1985 wherein he could assert that defendants defrauded him and seek, as a remedy therefor, rescission of the contract under which he purchased his partnership interest. Since in 1985 he had a right to rectify the torts defendants allegedly committed upon him, under the general rule of *Shreiber, Kozasa* and *Berg & Associates*, the five-year period of limitations in section 13—205 barred the action he brought in 1991.

---

[2]We further note that there is modern supreme court precedent (*Redarowicz v. Ohlendorf* (1982), 92 Ill. 2d 171, 185-86, 441 N.E.2d 324, 330-31) as well as a line of appellate court cases which omit reference to damages when detailing the elements of a *prima facia* case of fraud. *E.g., Seefeldt v. Millikin National Bank* (1987), 154 Ill. App. 3d 715, 506 N.E.2d 1052; *Hamming v. Murphy* (1980), 83 Ill. App. 3d 1130, 404 N.E.2d 1026; *Mother Earth, Ltd. v. Strawberry Camel, Ltd.* (1979), 72 Ill. App. 3d 37, 390 N.E.2d 393; *cf.* Polelle & Ottley, Illinois Tort Law 294 & n.138 (1985) ("In Illinois nominal damages will be awarded for deceit even where no actual or compensatory damages have resulted from fraud"), citing *Chalmers Motor Co. v. Maibaum* (1914), 186 Ill. App. 147; *Van Velsor v. Seeberger* (1890), 35 Ill. App. 598, 601. But see *Kelman v. University of Chicago* (1988), 166 Ill. App. 3d 137, 142, 519 N.E.2d 708, 711 ("[D]amages or injury are a necessary element of the tort [of fraud]"), *appeal denied* (1988), 122 Ill. 2d 576, 530 N.E.2d 246.

The lone case plaintiff relies upon in order to support the proposition that his cause of action did not accrue until he suffered an actual injury, *Bartholomew v. Crockett* (1985), 131 Ill. App. 3d 456, 475 N.E.2d 1035, does not compel us to reach an opposite conclusion. In *Bartholomew*, the plaintiff appealed from the trial court's grant of summary judgment and this court held that because whether she had suffered any actual injury could not be determined, "[her] cause of action for legal malpractice ha[d] not yet accrued and [was] therefore nonexistent." (*Bartholomew*, 131 Ill. App. 3d at 465-66, 475 N.E.2d at 1042.) In that case, since her action was based on the negligence of another, the plaintiff had no cause of action until she suffered an actual loss due to that negligence. (See *Jeffrey v. Chicago Transit Authority* (1962), 37 Ill. App. 2d 327, 185 N.E.2d 384 (first Illinois case which rejected the applicability of the presumed or nominal damages doctrine in the context of a negligence action and held that actual damages are a necessary element of negligence).) In the absence of a cause of action, the plaintiff was not "authorize[d] [to] *** bring[ ] *** an action [in the circuit court]." (*Schreiber*, 173 Ill. App. 3d at 131, 527 N.E.2d at 413.) In contrast, as discussed above, plaintiff here could have sought the assistance of the court as early as 1983 in an effort to redress the wrong allegedly perpetrated by defendants.

In addition, our supreme court has held:

> "A person who has been misled by fraud or misrepresentation is required, as soon as he learns the truth, to disaffirm or abandon the transaction with all reasonable diligence, so as to afford both parties an opportunity to be restored to their original position. If, after discovering the untruth of the representations, he conducts himself with reference to the transaction as though it were still subsisting and binding, he thereby waives all benefit of relief from the misrepresentations." (*Eisenberg v. Goldstein* (1963), 29 Ill. 2d 617, 622, 195 N.E.2d 184, 186-87.)

Applying the *Eisenberg* doctrine of "waiver by conduct," plaintiff, who harbored the knowledge that he had been defrauded for at least six years before indicating a desire to abandon the transaction, will be deemed to have waived his claim that defendants fraudulently induced him to buy the partnership interest. See *Madison Associates v. Bass* (1987), 158 Ill. App. 3d 526, 511 N.E.2d 690 (applying "waiver by conduct" doctrine to find waiver of counterclaim where the defendant knew of the fraud approximately four weeks before trial, but acted as though no fraud was perpetrated until filing fraud-based counterclaim at trial); *Bulley & Andrews, Inc. v. Symons Corp.* (1975), 25 Ill. App. 696, 323 N.E.2d 806 (holding that the plaintiff waived a claim based

on fraud in the formation of the contract when it remained silent for nine months after it could have reasonably discovered the fraud).

In *Kaiser v. Olson* (1981), 105 Ill. App. 3d 1008, 1014, 435 N.E.2d 113, 118, the court cogently explained the purpose of the waiver rule:

> "One is not permitted to lie back and speculate as to whether avoidance or affirmance of a contract will ultimately prove more profitable."

Yet, this is precisely what plaintiff proposes we allow him to do. He intimates that he was entitled to retain possession of his interest in the real estate partnership while it returned some benefit to him (a periodic distribution and an investment loss deduction which lowered his Federal income tax burden), but that, because he was defrauded, this court should authorize a return of his investment in the partnership once it caused him to lose money. Plaintiff proposes that we turn the Illinois tort system into a commodity futures market, thereby allowing investors to hedge their investments, when possible, with a cause of action for fraud until such time that the investment sours, at which point they would be able to cash in on their preserved cause of action for fraud. Clearly, under the case law touching upon the accrual of an action for fraud or the doctrine of waiver, this is not permitted in Illinois. Accordingly, the trial court's judgment dismissing plaintiff's causes of action is affirmed.

Affirmed.

McCORMICK, P.J., and DiVITO, J., concur.