LID ASSOCIATES *et al.*, Plaintiffs-Appellees and Cross-Appellants, v. CHARLES F. DOLAN *et al.*, Defendants-Appellants and Cross-Appellees.

First District (4th Division)   No. 1—00—0162

Opinion filed August 30, 2001.

Jenner & Block, of Chicago (Theodore Tetzlaff, Thomas Mulroy, Jr., Richard Gray, Richard Steinken, and William Ryan, of counsel), for appellants.

Canel, Davis & King, of Chicago (Jay Canel and Peter King, of counsel), for appellees.

PRESIDING JUSTICE HARTMAN delivered the opinion of the court:

Plaintiffs, limited partner investors in Cablevision of Chicago (Partnership), brought an action individually and derivatively on behalf of the Partnership against defendants, general partners Charles F. Dolan and Cablevision Systems Services Corporation (CSSC), for breach of fiduciary duty involving three financing transactions. Plaintiffs claim the transactions unfairly benefitted the general partners, to the detriment of the limited partners.[1] A jury found the issues for plaintiffs.

The issues presented on appeal include whether the circuit court erred (1) in allowing certain evidence as to plaintiffs' theory of breach of fiduciary duty; (2) in refusing to submit a defendants' statute of limitations instruction; (3) in refusing a separate verdict form to determine the liability of each defendant; and (4) whether individual verdicts for plaintiffs' claims should not have been submitted to the jury.

The issues presented on cross-appeal include whether the circuit court erred (1) by allowing Partnership indemnification of defendants' attorney fees and costs; (2) by denying forfeiture damages; (3) by not submitting the issue of punitive damages to the jury; and (4) by submitting a certain statute of limitations jury instruction.

Dolan, a cable industry pioneer, established the Partnership in

---

[1]The trial extended over two weeks and generated more than 15,000 pages of record, including testimony of 10 witnesses and over 7,000 pages of exhibits.

1979 for the purpose of bringing cable television to the Chicago area after a successful cable television venture in Long Island, New York. Bank loans to then-novel cable television companies were considered risky because the companies had few assets to pledge as collateral, needed long-term loans and had cash flow problems. Banks granting such loans in 1979 demanded restrictive loan covenants that required the borrowing cable company to maintain certain financial performance levels or face default.

Dolan formed three Illinois limited partnerships to raise capital for the Partnership. Prior to investing in the three limited partnerships, each plaintiff received a private offering memorandum, which included a copy of the partnership agreement and explained that there were substantial risks in investing in start-up cable companies in the early 1980s. Dolan testified that the partnership agreements for the Partnership and three limited partnerships were identical, except for monetary terms. Each plaintiff was required to certify that he or she had a substantial net worth, was sophisticated in business and financial affairs and had received the offering memorandum containing a copy of the partnership agreement.

Section 8.1(a) of the partnership agreement gave Dolan, as a general partner, authority to manage the partnership and enter into transactions in furtherance of the Partnership's business. Section 8.2(d) specifically authorized Dolan, as managing general partner, "to borrow or lend money upon any terms and conditions, including the subordination of such loans; *** guarantee indebtedness or obligations of others; provided, however, that [Dolan] determine in good faith that any such transaction is in furtherance of a Partnership purpose." Further, the partnership agreement in section 8.2(h) allowed Dolan, as managing general partner, "to engage in any kind of activity and to perform and carry out contracts of any kind necessary to, or in connection with, or incidental to the accomplishment of the purposes of the Partnership, as may be lawfully carried on or performed by a limited partnership under the laws of the State of Illinois."

The partnership agreement also specifically contemplated potential conflicts of interest in authorizing transactions with Dolan's affiliate companies.[2]

During 1979, Dolan created the first limited partnership, Cablevi-

---

[2]Section 8.5(a) provides in pertinent part:

"[T]he General Partners, on behalf of the Partnership and in their sole discretion, may deal in any manner directly or indirectly with any General Partner or any Limited Partner or any affiliate or firm in which any partner is directly or indirectly interested and may pay any

sion of Illinois (COI), using proceeds totaling $16,978,000 from the sale of COI partnership units to provide the initial financing for the Partnership.

On December 17, 1980, Dolan and William Bell, chief financial officer of the Partnership, successfully negotiated a loan with a group of banks led by Continental Illinois National Bank and Trust Company of Chicago (collectively Continental Bank) for $42 million at a prime plus 1½% interest rate, which was fully secured by Partnership assets. The loan agreement included numerous covenants and restrictions requiring the Partnership to meet certain standards for cash flow, number of subscribers and that Dolan remain personally involved in Partnership management. Failure to comply with these restrictions would give Continental Bank the right to terminate the loan.

The Partnership faced operational difficulties early on and intense competition to obtain multiple cable franchises, which significantly raised the cost of the local government franchising process. These circumstances resulted in geographically scattered franchises and increasing construction and technology costs. In addition, the Partnership faced cash flow shortages.

The Partnership's difficulties in obtaining cable franchises and meeting its revenue projections eventuated in its failure to satisfy Continental Bank's restrictions and it defaulted on its loan agreement. Dolan successfully persuaded Continental Bank in September of 1981 to extend the loan term and ease certain restrictions, however, in return for Dolan's agreement to guarantee personally up to $2 million of the bank loan.

In November 1981, Dolan formed the second limited partnership, Chicago Cablevision Investments (CCI), to raise an additional $12,616,831 in capital by selling CCI limited partnership interests.

---

such person fees or compensation *without limitation for any efforts or commitments in connection* with the development, financing, supervision and management of the Partnership or Partnership property or the acquisition thereof, *and neither the Partnership nor any other partner shall have any rights in or to any such fees or compensation* to any such person." (Emphasis added.)

In consideration of the limited partners interests' when borrowing from affiliates, the partnership agreement in section 8.5(c) provided:

"Anything contained in this Agreement to the contrary notwithstanding, any dealings or contracts with, and any payments, fees or compensation paid directly or indirectly, to any partner or affiliate of a partner shall be on terms no less favorable to the Partnership than would be available from unaffiliated third parties for comparable services, property or materials."

The CCI private offering memorandum disclosed the Partnership's then-existing financial problems and bank restrictions.[3]

The Partnership continued to struggle in 1982, but avoided another default when Dolan again persuaded Continental Bank to relax restrictions on the loan agreement. In return, Dolan was required to guarantee part of the debt personally until the Partnership could raise additional capital to reduce that debt.

Financial difficulties continued, and Dolan created a third partnership in 1983, Cablevision Headquarters Investments (CHI), which generated $8.125 million in additional capital through the sale of limited partnership interests. The CHI private offering memorandum disclosed that the Partnership had experienced difficulty in meeting certain covenants in the loan agreement since its inception and that Dolan personally had guaranteed repayment of a specific amount of debt, allowing Continental Bank to waive defaults. The new capital raised through the CHI offering and a new business plan for the Partnership temporarily kept the Partnership out of default.

The Partnership's financial woes increased dramatically in late 1984; it had used most of the $42 million available under its bank loan and again defaulted on the loan agreement. Continental Bank sought to dispose of the financing agreement and demanded that the Partnership pursue alternative long-term solutions to its financing problems. In compliance with this demand, on January 30, 1985, the Partnership called upon the limited partners of CCI to loan $37,500 for each Partnership unit owed to the Partnership at an 18% interest rate, in return for convertible debentures, as authorized by the articles of limited partnership establishing CCI.[4] Dolan previously delayed the request for the loans because of the high interest rate and the requirement that this interest be paid on a current basis. The Partnership raised $2.4 million through the 1985 loans from the limited partners, who then received current payments of 18% interest.[5]

Dolan contemplated selling the Partnership in 1985, but believed

---

[3]The CCI private offering memorandum included (1) the Partnership's problems in obtaining franchises and completing construction; (2) Dolan's personal guarantee of certain bank borrowings; (3) the commitment that $2 million of the money raised by CCI would be used to reduce bank borrowings; and (4) the restrictive covenants in the Continental Bank loan, including the requirement that Dolan continue to manage the partnership.

[4]The limited partners were obligated to make these debentures as part of their earlier capital commitments, but not all limited partners complied.

[5]The limited partners did not contest the 18% interest rate. Barry O'Leary, senior vice-president and treasurer of the Partnership and, until 1984, vice-president of the USA division of the Toronto Dominion Bank of Canada, testi-

he would not be able to obtain a sale price that would allow the investors to recover their initial investment. By the end of that year, when the Partnership carried more than $50 million in outstanding debt, it could not have been sold for more than $55 million, which would have caused plaintiffs to lose virtually their entire investments.

Repeated efforts to obtain new financing for the Partnership continued; however, the only feasible replacement bank financing was the First Canadian Bank, Bank of Montreal (Bank of Montreal), which offered a loan of $32 million, $10 million less than needed to pay off the debt to Continental Bank. The Bank of Montreal established four prerequisites with which the Partnership had to comply in order to receive replacement bank financing: (1) the Partnership was prohibited from paying any management fees during the time Dolan was required to continue managing the Partnership; (2) the Partnership had to raise $10 million to make up the difference between the $42 million Continental Bank loan and the $32 million offered by the Bank of Montreal; (3) the Partnership was required to pay off an outstanding $5.1 million account payable to Home Box Office (HBO), one of the Partnership's principal programming suppliers; and (4) any loans used to satisfy these prerequisites had to be unsecured, subordinated to the Bank of Montreal debt, with no acceleration rights or rights to receive current payments of principal or interest.

To satisfy these prerequisites and keep the Partnership afloat, Dolan turned to his affiliates for financing, which came about in three specific transactions and are at the heart of plaintiffs' case.

The first challenged transaction arose from a 1980 management agreement (management fees transaction) in which the Partnership received various management services from Dolan and his management company, Cablevision Systems Company (Management Company). In return for these services, the Partnership was obligated to pay the Management Company each month 3.5% of its gross monthly revenues as compensation for Dolan's personal management of the Partnership. All investors were informed about the Management Agreement prior to their having invested in the Partnership.

In December 1983, Continental Bank's prohibition against the current payment of management fees was memorialized in an amended credit agreement and was considered by the Partnership and its bankers to be permanently in place for the duration of the loan. Because the prohibition was considered permanent, the Partnership and the Management Company entered into an agreement dated December 31,

---

fied that in 1985, he was concerned about the Partnership's ability to undertake payment of 18% interest on a current basis.

1983, through Dolan, whereby the Management Company agreed to the indefinite deferral of monthly fees and the Partnership agreed to accrue interest, compounded monthly, on unpaid fees at the composite borrowing rate of Dolan's public company, Cablevision Systems Corporation (CSC). When Dolan sold partnership interests in CCI in 1981 and CHI in 1983, he did not mention this interest on the accrued fees; accruing interest for management fees, however, was listed in the 1985 and 1986 "Notes to Financial Statements" that the limited partners received, which disclosed that interest was being charged on deferred management fees and the amount of interest charged for that year. In 1986, the interest rate changed to prime plus 2% for simplicity of calculation purposes.

The management fees transaction freed for the Partnership funds that otherwise would have been required to pay management fees, enabling the Partnership to comply with the bank requirement that Dolan continue to provide management services without current pay. Bell and Patrick Cleary, a senior loan officer specializing in cable television company loans for the Continental Bank loan group, testified at trial that the Partnership could not have obtained a more favorable management services arrangement from an unaffiliated party; rather, the interest rate charged for this transaction was at a rate more favorable to the Partnership than it could have received for equivalent, outside financing. Bell also checked with independent parties for other interest rate terms, but he did not consult with parties outside the Cablevision sphere of companies.

In 1985, each limited partner received an information memorandum, noting that interest was being charged on the deferred management fees and, from 1985 through 1995, each investor was advised through annual financial statements that interest was being charged on deferred management fees, as well as the amount of interest charged each year.

The second challenged transaction involved a loan from Dolan's public company, CSC (CSC Loan), to the Partnership for $10 million to make up the shortfall between the $42 million owed to Continental Bank and the $32 million the Bank of Montreal was willing to refinance. Dolan previously secured a Partnership loan from CSC for approximately $9 million through 1985 to bring the Partnership into compliance with the financial restrictions in its loan agreement with Continental Bank. This balance and the additional $10 million were reflected in a single, unsecured note with a fixed interest rate of 14%, compounded quarterly, for the term of the loan and, as required by the

Bank of Montreal, gave CSC no acceleration rights and no right to receive current payments of principal or interest.[6]

In setting the Partnership interest rate at 14%, Dolan testified that the interest rate was below market rates from the time they were arranged until the time they were retired and still satisfied the Bank of Montreal's demands that any loans be subordinated to their debt, with no acceleration rights, no security and no current payments of principal or interest. Bell testified that before fixing the interest rate at 14%, CSC, which was much larger and more creditworthy than the Partnership, had to pay 19 1/2% on a subordinated debt requiring current interest payments. Cleary testified that in 1985, deeply subordinated debt commanded at least 20% interest and that, in 1988, when the Partnership's financial condition had improved, available subordinated debt still required current interest payments and an interest rate exceeding 20%. Gradually, the Bank of Montreal increased the Partnership's borrowing capacity to $60 million in 1989. This increased borrowing capacity allowed the Partnership to pay CSC $20 million in 1989, of which CSC credited $7,350,000 to principal and $12,649,420 to interest.

In March 1986, a Dolan memorandum informed each limited partner that, as a prerequisite of the Bank of Montreal refinancing agreement, CSC loaned the Partnership $10 million on terms fully subordinated to the bank loan. A May 1986 memorandum to the limited partners advised that CSC had advanced the necessary funds to the Partnership at an interest rate of 14% and that the loans were fully subordinated to the bank debt. Starting with the fiscal year 1986, the "Notes to the Financial Statements" disclosed the CSC Loan, the amount of principal owed, the amount of interest accrued, the amount of cumulative unpaid interest, the interest rate and the fact that the obligations were subordinated to the bank debt. As payments were made on this and other affiliate loans in 1989 and 1993-95, the "Notes to the Financial Statements" disclosed those payments.

The CSC Loan balance was paid after the 1995 sale of the Partnership. In total, CSC collected the $19,664,999 it loaned to the Partnership plus $28,217,823 in interest. CSC received $13,610,235 over the amount it paid to borrow the money it loaned to the Partnership.

---

[6]The 14% interest rate did not change although the interest CSC paid its lender dropped during a substantial part of the time the Partnership paid its interest to CSC. Also, the Partnership's business and credit rating improved during the term of the loan, and the Partnership's borrowing rate, which was tied to the London Interbank Offered Rate, dropped to as low as 5 1/2%. Nevertheless, uncontradicted evidence was adduced that interest rates on deeply subordinated, risky loans do not "float."

The third contested transaction, known as the HBO Loan, involves the CSSC affiliate loan Dolan arranged in late 1985 to satisfy the third prerequisite of the Bank of Montreal Loan, that the HBO account be paid off. CSSC guaranteed the Partnership's $5,093,302 account payable to HBO with a five-year note but paid no interest for four years; the fifth year paid interest at prime. The Partnership gave CSSC an unsecured, subordinated note for approximately $5,100,000 at an interest rate of 14%, compounded quarterly, with CSSC having no acceleration rights and no right to receive current payments of principal or interest. Bell and Cleary both testified that no better terms were available to the Partnership from unaffiliated sources. According to Bell, the HBO Loan was well below market interest rates throughout the life of the loan. HBO's loan was extended to a sixth year at prime and then was refinanced with another lender for 16 months at 13% interest.

In March 1986, each limited partner was sent a memorandum explaining that a Dolan affiliate would loan the Partnership $5 million to pay off a debt mentioned as intending "to satisfy this stipulated condition precedent," evidently referring to the HBO Loan. Starting with fiscal year 1986, the "Notes to the Financial Statements" disclosed the $5 million loan, the amount of principal owed, the amount of interest accrued, the cumulative amount of unpaid accrued interest, the interest rate and the fact that the obligations were subordinated to bank debt.

In 1987, CSSC became the corporate general partner of the Partnership. CSSC was repaid the $5,093,302 it advanced to the Partnership, plus $8,476,798 in interest. Because CSSC paid $1,477,949 in interest to an unaffiliated third party to loan the money to the Partnership and received $8,476,798 in interest from its loan to the Partnership, CSSC's profit was $6,998,848.

Neither the contracts nor the contract terms Dolan signed with his affiliates were sent to the limited partners. The Bank of Montreal refinancing and the supporting cash infusions from the Dolan affiliates permitted the Partnership to remain in business and gradually recover from its initial financial troubles.

The Partnership was sold in 1995 for $168.5 million. The Bank of Montreal loan was repaid; $12.3 million in principal and $15.6 million in accrued interest due on the CSC loan were repaid; and final management fee payments due to the Management Company were paid in the amount of $11,561,205 in fees and $8,374,047 in interest. After all Partnership debts were paid, sufficient proceeds were paid to the limited partners amounting to their initial investment of $37,719,831, plus a small profit. Dolan received $51,091,310 in excess of the costs

incurred by the general partners or their affiliates in keeping the Partnership sufficiently viable from 1979 to 1995.

Plaintiffs filed this action on November 29, 1995. The jury returned a verdict for plaintiffs in the amount of $18,372,894 for actual damages. The court added $6,493,895 in equitable, prejudgment interest, for a total judgment of $24,866,789. Defendants' motions for entry of judgment as a matter of law or, in the alternative, for a new trial, were denied.

Defendants appeal and plaintiffs cross-appeal, as first noted.

I

Defendants contend first that they were denied a fair trial because the circuit court erroneously admitted certain evidence presented by plaintiffs which was prejudicial to them and without support in the law.

A·

●1 Defendants insist that plaintiffs' expert witness testimony was improper because they testified as to the appropriate standard of conduct in a fiduciary duty case, which is a question of law. Defendants assert that the experts' testimony was highly prejudicial, misleading and confused the jury as to the proper legal standard to be applied. Defendants maintain that because the proper standard of fiduciary conduct is a legal question, it is the function of the judge to instruct the jury as to the applicable principles of law, rather than being interpreted by an expert. Defendants rely upon *McCormick v. McCormick*, 180 Ill. App. 3d 184, 205, 536 N.E.2d 419 (1988) (*McCormick*), where the court held testimony properly excluded where the expert purported to testify as to the "applicable standard of care" of a trustee, but merely applied the facts to the language in the Illinois Trust and Trustee's Act (now 760 ILCS 5/1 *et seq.* (West 1996)), formulating the opinion that the trustees were "imprudent in the performance of their duties." An expert witness, however, is not competent to give testimony amounting to statutory interpretation. *Christou v. Arlington Park-Washington Park Race Tracks Corp.*, 104 Ill. App. 3d 257, 261, 432 N.E.2d 920 (1982). Nor may an expert witness testify with respect to legal conclusions. *Coyne v. Robert H. Anderson & Associates, Inc.*, 215 Ill. App. 3d 104, 112, 574 N.E.2d 863 (1991); *McCormick*, 180 Ill. App. 3d at 205.[7]

●2 Here, over defendants' objections, plaintiffs' expert, Robert

---

[7] In *Sohaey v. Van Cura*, 240 Ill. App. 3d 266, 283-84, 607 N.E.2d 253 (1992) (*Sohaey*), the circuit court properly excluded proffered opinion testimony of plaintiffs' expert as to the standard of care for real estate brokers

Weitzman, a real estate and trust lawyer involved in real estate general and limited partnerships, testified to the custom and practice of a general partner in financing loans for partnerships with which he had personal experience as a general partner and his knowledge of what general partners do in like circumstances. Plaintiffs' witness commented further and identified a legal standard for fiduciary duty, stating, "I think that *in every fiduciary relationship of general to limited partner, the general is charged with the fact of having to act reasonable [sic] and fair [sic]* with his limited partners at all times." (Emphasis added.) Additionally, the witness expressed an opinion as to the ultimate issue of whether Dolan breached his fiduciary duty, stating, "I think in this transaction his [affiliate loan] cost floated down, and [the interest rate to] the limiteds' [sic] stayed right where they started. *That's not fair.*" (Emphasis added.)

Weitzman having based his opinions on his interpretation of case law, exceeded his role as an expert, which was error. Another fiduciary expert testified for plaintiff, Charles Strobeck, involved in general and limited partnerships in the real estate business, whose testimony was substantially the same as that given by Weitzman.

Plaintiffs' fiduciary experts' opinions differed from the circuit court's instructions to the jury, which stated that, under Illinois law, "partners are free to vary many aspects of their relationship" as long as they do not "destroy its fiduciary character" and "where a partnership agreement exists and the agreement specifically sets forth what the fiduciary is required to do or not to do with respect to a matter, the terms of the partnership agreement should be considered" in determining whether the fiduciary breached his duty. Weitzman and Strobeck advocated a standard of fiduciary conduct that disregarded the partnership agreement by requiring that a general partner loan money to the partnership at his own or his affiliates' cost of bank borrowing, regardless of what the partnership agreement states. No Illinois authority is cited or found which supports such an obligation. Plaintiffs emphasized this "expert" testimony throughout the trial, including opening statements and closing argument. Plaintiffs offered no other proof that the transactions were unfair.

Accordingly, the circuit court abused its discretion in allowing this

---

and barred the testimony after concluding that the possibility of creating confusion for the jury as to the existing standard of care might have caused the jury to rely on the expert for a legal conclusion which he was not competent to give, rather than following the instructions of the court. *Sohaey,* 240 Ill. App. 3d at 283. But see *Everen Securities, Inc. v. A.G. Edwards & Sons, Inc.,* 308 Ill. App. 3d 268, 277-78, 719 N.E.2d 312 (1999).

testimony of plaintiffs' expert witnesses, the prejudicial effect of which requires that the jury verdict be set aside and defendants be granted a new trial. See *Parker v. Illinois Masonic Warren Barr Pavilion*, 299 Ill. App. 3d 495, 504-05, 701 N.E.2d 190 (1998).

## B

•3 Defendants next assert that the circuit court erred in denying their motion *in limine* to preclude plaintiffs from presenting evidence of the cost of capital for each of Dolan's affiliates for the three disputed transactions. They contend this evidence seriously prejudiced defendants because it permitted the jury to conclude that Dolan breached his fiduciary duty by arranging financing at a higher interest rate than the borrowing rate of his affiliates. According to defendants, the jury's assessment of the fairness of interest rates should be determined by the creditworthiness of the borrower (the Partnership), not the lender (the affiliates). The greater risk of default by the borrower permits a higher interest rate to be charged by the lender. Here, the Dolan affiliates made unsecured, deeply subordinated, hazardous loans to a borrower with a track record of chronically being on the verge of default, and being in default—loans with no current payments of interest or security.

Nothing in the partnership agreement, nor in the law, required Dolan to seek out loan financing under similar circumstances; the record shows that loan financing was necessitated by many economic factors. Nor were defendants specifically required to consult with plaintiffs before entering into any of the challenged transactions under section 8.5 of the partnership agreement, as previously noted. Although the supreme court in *Bakalis v. Bressler*, 1 Ill. 2d 72, 78-79, 115 N.E.2d 323 (1953), held that in a fiduciary relationship existing between partners, all forms of secret dealing and preference of self in matters relating to and connected with the partnership are prohibited, here, the partnership agreement authorized defendants' actions and, in any event, defendants informed plaintiffs of the challenged transactions after they were entered into. This information came by way of the annual financial disclosure statements distributed to each limited partner. A professor of accounting and general partner in a financial analysis and evaluation firm, Mark Zmijewski, testified for defendants, without contradiction, that these disclosures were fair, adequate and met recognized accounting standards.

Plaintiffs' partnership experts conceded that a 2% to 5% "premium" over and above the cost of capital may be earned appropriately by a managing partner by virtue of his having arranged loans through his affiliates; however, those percentages are not reflected in the jury's

verdict. Rather, the jury appears to have based its awards upon the testimony of plaintiffs' accountant, Mark J. Hosfield, a partner with Arthur Andersen, who predicated damages on the difference between the amount of interest paid by the Partnership to the Dolan affiliates and the amount of interest paid by the affiliates for their loans, the so-called "straight pass-through" theory. Hosfield computed the damages calculations by utilizing evidence of cost of capital, the affiliates' cost of making the loans. The evidence reveals that the Partnership's ability to secure loans from unaffiliated sources was exhausted, forcing Dolan to secure funding from himself and his affiliates. The loans that were secured could not have been on terms less favorable to the Partnership from unaffiliated third parties, as prescribed by section 8.5(c) (quoted in footnote 1), and the cost of capital became irrelevant. The inclusion of this evidence was prejudicial and erroneous.

The verdicts on the HBO Loan, CSC Loan and management fees transaction reveal that the jury was influenced by Dolan's failure to require his affiliates to loan the Partnership money at the lower rate at which the financially sound affiliates could themselves borrow money. Plaintiffs' cost of capital evidence permitted the jury to consider this unauthorized theory of liability and damages to defendant's prejudice.

Upon retrial, the jury should not be permitted to weigh evidence of "straight through" cost of capital to the general partners and their affiliates as the appropriate measure of damages.

## C

●4 Defendants urge that all three challenged affiliate transactions were fair under the objective standard of fairness established by Illinois law and incorporated into the partnership agreement under section 8.5(c). Defendants rely on *Shlensky v. South Parkway Building Corp.*, 19 Ill. 2d 268, 283, 166 N.E.2d 793 (1960) (*Shlensky*), which pinpointed factors to be considered in assessing the fairness of transactions, including: (1) whether the corporation received full value in all the commodities purchased; (2) the corporation's need for the property; (3) its ability to finance the purchase; (4) whether the transaction was at market price or below or constituted a better bargain than the corporation otherwise could have obtained in dealings with others; (5) whether there was a detriment to the corporation as a result of the transaction; (6) whether there was a possibility of corporate gain siphoned off by the directors directly or through corporations they controlled; and (7) whether there was full disclosure. Defendants argue, and the circuit court agreed, that had not Dolan and Dolan's affiliates entered into the three transactions, considering the Partner-

ship's dire financial straits, the Partnership would have folded and the limited partners would have lost not only any possible profits from their investments, but their investments themselves.

The partnership agreement gave Dolan express authorization to enter into transactions with his affiliates in section 8.5. Section 8.2(h) gave Dolan authority to allow the Partnership to accrue interest on management fees and affiliate transactions in furtherance of Partnership purposes. The provisions of section 8.5(c) also supported these transactions. Section 10.1 expressly allows interest to be paid to any partner for loans made by the partner to the Partnership, above and beyond his capital account. Defendants' witnesses, Bell, Cleary and O'Leary testified that the terms of the agreements were fair and would not have been available from unrelated third party lenders.

●5 First, analyzing whether the transaction was at the market price or below, or constituted a better bargain than the Partnership could have obtained otherwise, the testimony of Bell, Cleary and O'Leary, as financial experts, was that the transactions with Dolan's affiliates were fair. Further, the transactions were required to comply with the Bank of Montreal's firm prerequisites of subordination, no security, no acceleration clauses and no current payments of principal or interest. Significantly, plaintiffs offered no countervailing evidence of outside lending offers to compare with the affiliates' rates. Plaintiffs' accounting expert, Hosfield, gave no opinion as to the reasonableness or fairness of the interest rates charged in the three transactions. The only evidence even remotely addressing this issue was the testimony of Weitzman and Strobeck, with respect to the allegedly permissible 2% to 5% premium on the interest charges available to defendants. Second, whatever detriment may be said to have resulted to the Partnership from the transactions, clearly, they ultimately saved the Partnership. Third, there was no evidence that any Partnership gain was siphoned off by defendants from interests they controlled. Finally, defendants disclosed the loans in the Partnership's annual financial statement to each limited partner, the amount of principal owed, the amount of interest accrued, the amount of unpaid cumulative interest, the interest rate and that the obligations were subordinated to the bank debts.[8]

Under Illinois law, a general partner will not be deemed in breach of his fiduciary duties where he has complied with an express authorization in the partnership agreement. *Adler v. William Blair & Co.*, 271 Ill. App. 3d 117, 131-32, 648 N.E.2d 226 (1995). Plaintiffs here

---

[8]The facts that the loans were unsecured, with no acceleration rights and prohibited current payments of principal and interest were not disclosed.

challenged the fairness of the interest rates; however, Dolan had express authority under the partnership agreement to enter into such transactions. Evidence of fairness was adduced through the testimony of Dolan, Bell, Cleary, O'Leary and the terms of the Continental and Montreal Bank loans. Although only a modicum of countervailing evidence was presented by plaintiffs, in the form of plaintiffs' partnership experts' assertion that a premium amounting to 2% or 5% was a permissible level of profit, a jury question of fairness was thereby created, requiring a new trial.

## D

Defendants next assert that plaintiffs failed to prove any legally cognizable damages proximately caused by the Partnership having entered into the three challenged transactions because the Partnership benefitted greatly from Dolan's actions in arranging for the affiliate loans that permitted the Partnership to survive and to continue its operations. Accordingly, defendants deem themselves entitled to judgment as a matter of law. *Kennan v. Checker Taxi Co.*, 250 Ill. App. 3d 155, 159-60, 620 N.E.2d 1208 (1993).

•6 The determination of damages is the function of the jury as a question of fact (*Snover v. McGraw*, 172 Ill. 2d 438, 447, 667 N.E.2d 1310 (1996)) (*Snover*) and it is within their province to weigh conflicting evidence. *Ross v. Aryan International, Inc.*, 219 Ill. App. 3d 634, 647, 580 N.E.2d 937 (1991); *Piper v. Moran's Enterprises*, 121 Ill. App. 3d 644, 653, 459 N.E.2d 1382 (1984). A jury's award of damages is entitled to substantial deference. *Snover*, 172 Ill. 2d at 447. A reviewing court will not upset a jury's award of damages "unless a proven element of damages was ignored, the verdict resulted from passion or prejudice, or the award bears no reasonable relationship to the loss suffered." *Gill v. Foster*, 157 Ill. 2d 304, 315, 626 N.E.2d 190 (1993).

Defendants agreed that the jury instructions requiring plaintiffs to prove damages calculated as "the difference between the amounts of money Plaintiffs would have received had there been no breach of duty and the amount of money actually received," were proper. Defendants claim, however, that plaintiffs failed to prove any damages were proximately caused by any conduct by or breach of defendants. At trial, plaintiffs used numerous charts to explain evidence of damages. During opening statements, defense counsel agreed that the numbers in plaintiffs' charts were correct and Dolan's testimony corroborated the figures. Nevertheless, the law requires that, within a fair degree of probability, the evidence must establish a basis for the assessment of damages. *Schatz v. Abbott Laboratories, Inc.*, 51 Ill. 2d 143, 148, 281 N.E.2d 323 (1972).

●7 Here, the record shows evidence of the amount of interest Dolan's affiliates charged as a result of the three challenged transactions and evidence of changing market interest rates over the lives of the loans. Although Dolan agreed to the accuracy of the arithmetic, he did not agree that the varying interest rates proximately caused cognizable legal damages to plaintiffs.

Nevertheless, the evidence adduced through plaintiffs' partnership experts as to the reasonableness of a 2% to 5% premium available to Dolan and his affiliates stands as some evidence of damage when compared to the interest actually charged them. Plaintiffs' assertion, without citation to authority, that Dolan and his affiliates should have extended to them the use of below-market-rate funds that were otherwise unavailable to the Partnership without charge is without basis in the law.

Plaintiffs' evidence as to damages proximately caused by the three challenged Dolan affiliate loans does not support the sums awarded to them by the jury. The damage award must be vacated and the cause remanded for a new trial as to this issue.

## II

●8 Defendants next argue that plaintiffs' counsel deliberately prejudiced defendants by telling the jury during closing arguments that Dolan was a "billionaire," in direct violation of a court order barring reference to Dolan's wealth. Because this issue may reemerge on retrial, it will be considered here.

During closing argument, referring to the management fees transaction, plaintiffs' counsel quoted Dolan's testimony that the management fees were just like salary, and stated, "[i]t isn't like salary. Dolan's a billionaire. He doesn't need salary." Defense counsel promptly objected to these statements, which the circuit court sustained.

Defendants rely on *Lorenz v. Siano*, 248 Ill. App. 3d 946, 953, 618 N.E.2d 666 (1993), and *Fopay v. Noveroske*, 31 Ill. App. 3d 182, 199, 334 N.E.2d 79 (1975) (*Fopay*), for the proposition that evidence of the financial condition of the parties is irrelevant and highly prejudicial on the subjects of liability and compensatory damages.[9] The challenged characterization by plaintiffs' counsel was impermissible and prejudicial.

---

[9]*Fopay* also states, however, that "the law in Illinois clearly allows evidence of the defendant's net worth and pecuniary position in cases in which punitive damages are proper." 31 Ill. App. 3d at 200. Cases involving breach of fiduciary duty permit recovery of punitive damages. See *Levy v. Markal Sales Corp.*, 268 Ill. App. 3d 355, 378-79, 643 N.E.2d 1206 (1994) (*Levy*). Although plaintiffs' amended complaint pleaded punitive damages, the circuit court

Plaintiffs' counsel's statements also violated an order *in limine* barring statements involving Dolan's wealth, which can be a ground for a new trial. *Rutledge v. St. Anne's Hospital*, 230 Ill. App. 3d 786, 794-95, 595 N.E.2d 1165 (1992); *Cancio v. White*, 297 Ill. App. 3d 422, 434, 697 N.E.2d 749 (1998). Improper comments at closing argument do not constitute reversible error unless substantial prejudice is shown. *Tierney v. Community Memorial General Hospital*, 268 Ill. App. 3d 1050, 1061, 645 N.E.2d 284 (1994). A reviewing court will not grant a new trial unless the argument clearly was improper, prejudicial and denied defendant a fair trial when that trial is viewed in its entirety. *Stennis v. Rekkas*, 233 Ill. App. 3d 813, 829-30, 599 N.E.2d 1059 (1992).

Dolan testified that as a condition of keeping the Continental Bank loan, he had to guarantee personally up to $2 million. A $2 million guarantee does not support an inference that the guarantor is a billionaire, nor does the return on investments. Additionally, the return on investments in other entities does not permit such speculation.

For these reasons, plaintiffs' counsel's comments as to Dolan's "billionaireship" were prejudicial and should not be repeated upon retrial of this case.

### III

Defendants next assert that the circuit court erred by refusing defendants' statute of limitations instruction and substituting its own instruction for that issue.[10] The court refused this instruction on the basis that most of the payments for the management fees transaction and loan agreements took place within five years from the date plaintiffs' action was filed. The court further stated the statute did not

---

directed a verdict against plaintiffs on that issue, raising a question of whether counsel's statement was prejudicial in light of the fact that the jury could render a verdict of only compensatory damages and not punitive damages. If undue emphasis is placed on this evidence or if the jury's verdict is affected by it, reversal is required. *McKasson v. Zimmer Manufacturing Co.*, 12 Ill. App. 3d 429, 439, 299 N.E.2d 38 (1973). Improper statements made during closing arguments compound prejudice. *Hickey v. Chicago Transit Authority*, 52 Ill. App. 2d 132, 139-40, 201 N.E.2d 742 (1964).

[10]Defendants proposed the following instruction:

"If you find that Defendants have proved, by a preponderance of the evidence, that Plaintiffs had actual knowledge of facts sufficient to put them on notice that they may have suffered an injury arising from some of the loan transactions before November 29, 1990, your verdict should be for Defendants on Plaintiffs' breach of fiduciary duty claims as to each such loan transaction."

begin to run "by virtue of the fact that there may have been an agreement entered into to defer payment and to charge interest or an agreement entered into that a given—for a loan to be given at a given rate of interest until payment is made. I do not believe that there were any damages suffered by the Plaintiffs prior to the payment of funds."

●9 Each party is entitled to have the jury clearly and fairly instructed upon each theory supported by evidence. *Seitz v. Vogler*, 289 Ill. App. 3d 1029, 1044, 682 N.E.2d 766 (1997) (*Seitz*). A reviewing court will not disturb the circuit court's determination of instructions unless the court clearly abused its discretion. *Seitz*, 289 Ill. App. 3d at 1044. In determining the propriety of the tendered instructions, the test is whether the jury was fairly, fully and comprehensively informed about the relevant principles, considering the instructions in their entirety. *Leonardi v. Loyola University*, 168 Ill. 2d 83, 100, 658 N.E.2d 450 (1995).

Defendants rely on *DeSantis v. Brauvin Realty Partners, Inc.*, 248 Ill. App. 3d 930, 935-38, 618 N.E.2d 548 (1993) (*DeSantis*), in urging that the limitations period begins to run when plaintiff discovered or reasonably should have discovered facts sufficient to put him on notice of the fiduciary breach. In *DeSantis*, the court held that a five-year cause of action for fraudulent misrepresentation accrued on the date on which plaintiff could have asserted that the partnership defrauded him and sought recission of contract as a remedy. 248 Ill. App. 3d at 937-38. The court ruled that the date plaintiff suffered actual injury was irrelevant. *DeSantis*, 248 Ill. App. 3d at 937. The *DeSantis* court, quoting *Kaiser v. Olson*, 105 Ill. App. 3d 1008, 1014, 435 N.E.2d 113 (1981), stated, " '[o]ne is not permitted to lie back and speculate as to whether avoidance or affirmance of a contract will ultimately prove more profitable.' " 248 Ill. App. 3d at 938. Defendants further rely on *Armstrong v. Guigler*, 174 Ill. 2d 281, 294, 673 N.E.2d 290 (1996), which holds that in an action for breach of fiduciary duty, the statute of limitations is five years.

Plaintiffs respond that defendants breached their fiduciary duty by not disclosing material facts of the three disputed transactions and any failure on their part to use even ordinary diligence to discover undisclosed facts is excused; therefore, any statute of limitations does not run until plaintiffs have actual knowledge of the facts upon which their claims are based. Plaintiffs cite no authority in support of their theory that the statute of limitations should begin to run only after the money was taken.[11]

There was evidence that plaintiffs could have brought a breach of

---

[11]The legal authority upon which plaintiffs rely regarding the tolling of

fiduciary duty claim seeking declaratory or injunctive relief more than five years before they actually brought suit and before any payments actually were made. *Battaglia v. Battaglia*, 231 Ill. App. 3d 607, 616, 596 N.E.2d 712 (1992). Plaintiffs' claim for breach of fiduciary duty here is based on how defendants established the interest rates, not the accrual of money based on those rates. The annual financial statements did in fact disclose that the Partnership had borrowed funds from Dolan affiliates. The financial statements also disclosed that interest was being charged on deferred management fees, the amount of interest charged on those fees, the amount of principal owed on the affiliate loans, the amount of interest accrued, the amount of cumulative unpaid interest, the interest rates for the loans and that the three obligations were subordinated to the bank debt. Professor Zmijewski testified that these disclosures were fair, adequate and met recognized accounting standards. The private offering memoranda for Dolan's sublimited partnerships, COI, CCI and CHI, all stated, "AN INVESTMENT IN THE PARTNERSHIP IS SPECULATIVE AND INVOLVES A HIGH DEGREE OF RISK OF LOSS." See *DeSantis*, 248 Ill. App. 3d at 931. The memoranda also had sections discussing the details of why investing in cable television is highly speculative.

In *Lagen v. Balcor Co.*, 274 Ill. App. 3d 11, 17, 653 N.E.3d 968 (1995) (*Lagen*), plaintiffs alleged defendants' failure to disclose material facts fraudulently induced plaintiffs to become limited partners in various real estate enterprises. Analyzing the limited partnership's private placement memorandum, the court stated, " 'silence in a business transaction does not amount to fraud.' " *Lagen*, 274 Ill. App. 3d at 17, quoting *Heider v. Leewards Creative Crafts, Inc.*, 245 Ill. App. 3d 258, 269, 613 N.E.2d 805 (1993) (*Heider*). Only when a party's silence is " 'accompanied by deceptive conduct or suppression of material facts' resulting in an active deception does the party have a duty to speak." *Lagen*, 274 Ill. App. 3d at 17, quoting *Heider*, 245 Ill. App. 3d at 269.

●10 Nothing in the record demonstrates that defendants participated in active deception of the limited partners. Private offering memoranda were proposed only to persons with sophistication in business and financial affairs. From the information revealed to plaintiffs, they reasonably could have discovered defendants' alleged breach from the "Notes to Financial Statements," starting as early as 1985, which disclosed that the Partnership had an agreement with CSSC to provide management services. The statement also noted that interest was be-

---

the limitations period is inapplicable because those cases involve fraud, which is not at issue in this case.

ing accrued on the unpaid balance of management fees at prime plus 2%. Plaintiffs filed their breach of fiduciary duty claim on November 29, 1995. Therefore, the circuit court should have allowed a statute of limitations instruction for the HBO Loan and management fees transaction and must do so on retrial.

The circuit court did allow a statute of limitations jury instruction for the CSC Loan. Defendants argue that they are entitled to judgment for the CSC Loan because the jury verdict found that plaintiffs' claim accrued more than five years before they filed suit. The statute of limitations begins to run when a reasonable person possesses sufficient information to be put on inquiry to determine whether a cause of action exists. *Knox College v. Celotex Corp.*, 88 Ill. 2d 407, 415-16, 430 N.E.2d 976 (1981). Similar to the management fees transaction and HBO Loan, plaintiffs possessed sufficient information to be put on inquiry starting in 1986, where the "Notes to Financial Statements" noted the CSC Loan for $10 million and the 14% interest rate converted to a $19,665,061 note bearing interest at 14% per annum. Plaintiffs filed their cause of action on November 29, 1995.

As noted, the jury in the instant case specifically found that prior to November 29, 1990, plaintiffs had "actual knowledge sufficient to put them on notice that they may have suffered injury" with respect to the CSC Loan. The circuit court should have barred plaintiffs from recovery for the CSC Loan; it was error not to have done so. See *Benton v. Vonnahmen*, 288 Ill. App. 3d 199, 205-06, 679 N.E.2d 1270 (1997).

Accordingly, that portion of the jury verdict relating to damages by virtue of interest charged by Dolan on deferred management fees and interest rates for the HBO Loan he negotiated are vacated, the judgment is reversed and the cause remanded for a new trial as to when plaintiffs should have inquired and taken appropriate action. The verdict concerning the CSC Loan must be vacated and the judgment is reversed without remandment.

### IV

•11 Defendants next maintain that the circuit court erred in submitting a verdict form without distinguishing between defendants Dolan and CSSC. The verdict form asked whether defendants breached their fiduciary duty to plaintiffs by causing Cablevision of Chicago to pay interest on management fees, the HBO Loan and the CSC Loan. Defendants submitted a verdict form listing verdicts for Dolan and CSSC separately. Plaintiffs do not dispute that Dolan and CSSC are separate legal entities, but rely on *Farnsworth v. Lamb*, 6 Ill. App. 3d 785, 790-91, 286 N.E.2d 74 (1972), arguing that each defendant was

not entitled to a separate determination of liability because they acted jointly to cause plaintiffs' injuries. In *Farnsworth*, however, defendants were found to have obtained an improper payment jointly and divided the money between them. 6 Ill. App. 3d at 790-91. There is no record evidence that CSSC and Dolan acted in concert as the basis of a breach of fiduciary duty, particularly since CSSC became a general partner of Cablevision of Chicago only after the three transactions already had been arranged. The jury should have been permitted to make a separate determination of liability as to each defendant. See *Wright v. Royse*, 43 Ill. App. 2d 267, 282, 193 N.E.2d 340 (1963); *Curtis v. Kaderbek*, 321 Ill. App. 471, 475, 53 N.E.2d 277 (1944).

Upon retrial of the case, separate verdict forms as to each defendant should be submitted to the jury.

## V

Defendants last contend that they are entitled to judgment on the individual plaintiff claims because there is no evidence that any plaintiff suffered a distinct personal injury. Plaintiffs assert both individual and derivative claims based on the same alleged injury: that the amount of money they received after the sale of the Partnership in 1995 was reduced because defendants caused the Partnership to pay Dolan and his affiliates unauthorized or excessive interest on the three challenged transactions. Defendants claim that any such injury resulting from the Partnership's payment of interest was an injury to the Partnership, which affected all limited partners derivatively and in common. Plaintiffs concede that any money defendants improperly took from the limited partners who are not named in this lawsuit must be returned to the partnerships through the derivative actions, but argue the named plaintiffs are entitled to proceed directly.

•12 Limited partners are in positions analogous to shareholders and cannot pursue individual actions for damages to their interests in a limited partnership. *Northern Trust Co. v. VIII South Michigan Associates*, 276 Ill. App. 3d 355, 363, 657 N.E.2d 1095 (1995) (*VIII South Michigan*). Shareholders of a corporation who are injured by a diminution in the value of their shares cannot proceed individually to assert the corporate claim, but must proceed by means of a derivative suit. *VIII South Michigan*, 276 Ill. App. 3d at 363. Plaintiffs maintain they did not bring a cause of action because the value of their interests in the Partnership diminished, but because the general partners diverted much of the proceeds from the sale of the assets of the Partnership to themselves through their affiliates.

In *Frank v. Hadesman & Frank, Inc.*, 83 F.3d 158, 160 (7th Cir. 1996) (*Frank*), the court looked to Illinois law to decide whether

plaintiff shareholder's claim properly was asserted as a derivative action in a diversity jurisdiction determination and found that "when investors have been injured in common, they must continue to act through their collective—the corporation."[12] In the case *sub judice*, plaintiffs could prevail only by showing a breach of fiduciary duty to the Partnership. Therefore, plaintiffs were required to bring their claims in a derivative action, entitling defendants to judgment as a matter of law with regard to plaintiffs' individual claims.

The verdicts favoring individual plaintiffs are set aside and the judgment is reversed in this aspect of the case. Upon remandment, the circuit court is directed to permit amendments to existing pleadings so as to reflect the foregoing conclusions.

## VI

On cross-appeal, plaintiffs initially assert that the circuit court erred in allowing defendants indemnification with respect to attorney fees and costs. Defendants maintain that the partnership agreement specifically provided for indemnification for attorney fees.[13]

●13 Interpretation of the partnership agreement requires *de novo* review. *Ford v. Dovenmuehle Mortgage, Inc.*, 273 Ill. App. 3d 240, 244, 651 N.E.2d 751 (1995) (interpreting a written contract). Plaintiffs argue that section 8.9 should not apply in this case because the jury found Dolan was not acting in furtherance of the Partnership's interests; rather, he was acting to benefit himself at the expense of the limited partners and the Partnership. Plaintiffs rely on *Wright v. City of Danville*, 174 Ill. 2d 391, 408-09, 675 N.E.2d 110 (1996) (*Wright*), in

---

[12]In resolving the issue of when investors should bring an individual suit as opposed to a derivative suit, the *Frank* court stated:

> " 'An action in which the [investor] can prevail only by showing an injury or *breach of duty* to the corporation should be treated as a derivative action.... An action in which the [investor] can prevail *without showing* an injury or *breach of duty* to the corporation should be treated as a direct action that may be maintained by the [investor] in an individual capacity.' " (Emphasis added.) *Frank*, 83 F.3d at 160, quoting The American Law Institute's Principles of Corporate Governance: Analysis and Recommendations § 7.01 (1992).

[13]The relevant portion of the partnership agreement, section 8.9, provided:

> "The Partnership shall indemnify and hold harmless each of the General Partners (including any partner, officer, director, shareholder or agent of a Corporate General Partner) from any loss, damage, fine, penalty, expense (including attorneys' fees), judgment or amounts paid in settlement by such General Partner by reason of any act performed by him or it or omitted to be performed by him or it in connection with the business of the Partnership, or in furtherance of its interests ***."

asserting that parties who are found guilty of self-dealing are not entitled to indemnification. In *Wright,* the court determined that plaintiffs were not entitled to indemnification where they were not serving a public purpose or acting pursuant to authority within the scope of their employment in committing criminal official misconduct (174 Ill. 2d at 409); however, the court there was interpreting a statute allowing for the indemnification of local public employees, which is not applicable to the instant case. See 174 Ill. 2d at 401.

●14 Contracts of indemnity against one's own negligence have been found valid and enforceable. *Burlington Northern R.R. Co. v. Pawnee Motor Service, Inc.,* 171 Ill. App. 3d 1043, 1045, 525 N.E.2d 910 (1988). An indemnification agreement is like any other contract; a court must give effect to the intention of the parties as determined from the language of the agreement, where no ambiguity exists. *Fort Dearborn Cartage Co. v. Rooks Transfer Co.,* 136 Ill. App. 3d 371, 375, 483 N.E.2d 618 (1985).

●15 The plain language of the partnership agreement in this case unequivocally would have covered defendants' liability arising from any breach of fiduciary duty. Therefore, the circuit court correctly held that defendants were entitled to reimbursement.

## VII

Plaintiffs next contend the circuit court erred by not allowing forfeiture damages after the verdict. The court found that Dolan's conduct was not so egregious that forfeiture damages were warranted.

●16 The appropriate remedy for breach of a fiduciary duty to a principal is within the equitable discretion of the court. *In re Marriage of Pagano,* 154 Ill. 2d 174, 190, 607 N.E.2d 1242 (1992). As a matter of public policy, a willful and deliberate breach of a fiduciary duty requires complete forfeiture of all compensation during the period of the breach. *ABC Trans National Transport, Inc. v. Aeronautics Forwarders, Inc.,* 90 Ill. App. 3d 817, 838, 413 N.E.2d 1299 (1980).

In the instant case, the breach, if any, was not shown to have been willful and deliberate. Defendants entered into the three challenged transactions in order to comply with prerequisites for bank loans. There is no evidence that Dolan sought loans for the Partnership in order to profit on the interest rates. In fact, if Dolan had not entered into these transactions, the Partnership would not have survived, and plaintiffs would have lost their entire investments. Accordingly, the circuit court's decision to deny forfeiture damages must be affirmed.

## VIII

●17 Plaintiffs next claim that they were entitled to a trial on punitive damages because there was substantial evidence that defendants

willfully and knowingly breached their fiduciary duties. The decision to submit the issue of punitive damages to the jury is a matter reserved to the circuit court and its decision will not be reversed absent an abuse of discretion. *Levy*, 268 Ill. App. 3d at 378-79. The purpose of punitive damages is not to provide compensation to plaintiffs, but to punish defendant and for deterrence; therefore, punitive damages can be awarded only for conduct that is outrageous either because defendant's acts are done with evil motive or a reckless indifference to others' rights. *Loitz v. Remington Arms Co.*, 138 Ill. 2d 404, 415-16, 563 N.E.2d 397 (1990).

The record here indicates that defendants did not enter into the three disputed transactions based on evil motive or reckless indifference to the limited partners' rights. Defendants' actions were not secret and did not amount to punitive misconduct. Further, plaintiffs rely only on the multi-million dollar verdict as proof that defendants acted willfully, but present no other evidence of conduct amenable to a punitive damages award.

The circuit court did not abuse its discretion in deciding not to submit a punitive damages issue to the jury.

## IX

Plaintiffs lastly assert that because material information was not disclosed to them, the circuit court erred in submitting to the jury the statute of limitations instruction on the CSC Loan. This issue has been addressed previously under Point III of the opinion, concluding that plaintiffs' cause of action on this loan was time-barred from recovery by virtue of the statute of limitations.

For the reasons set forth above, the judgment is affirmed in part, reversed in part, and in part reversed and remanded for a new trial.

Affirmed in part, reversed in part, and reversed and remanded in part, with instructions.

HOFFMAN and SOUTH, JJ., concur.